1  ELLEN LONDON (Cal. Bar No. 325580)
   elondon@londonnaor.com
2  MICHAEL LUNDHOLM (Cal. Bar No. 336151)
   rnaor@londonnaor.com
3  LONDON & NAOR P.C.
   1999 Harrison Street, Suite 2010
4  Oakland, CA 94612
   Telephone: (415) 862-8485
5  Facsimile:  (415) 862-8487

6  NICOLE M. NORRIS (Cal. Bar No. 222785)
   nicole@wittliffcutter.com
7  JOHN SABA (*pro hac vice forthcoming*)
   john@wittliffcutter.com
8  MATTHEW K. GATES (*pro hac vice forthcoming*)
   matt@wittliffcutter.com
9  WITTLIFF CUTTER, PLLC
   510 Baylor Street
10 Austin, TX 78703
   Telephone: (512) 960-4865

11

12 Attorneys for Plaintiff
   TAX ANALYSTS, INC.

13

14 **UNITED STATES DISTRICT COURT**
   **NORTHERN DISTRICT OF CALIFORNIA**

15

| | |
|---|---|
| 16  TAX ANALYSTS, INC. | Case No. |
| 17          Plaintiff. | |
| 18  v. | **COMPLAINT FOR:** |
| | 1. **COPYRIGHT INFRINGEMENT** |
| 19  ORBITAX, LLC, GRATIAN | 2. **TRADEMARK INFRINGEMENT** |
|    JOSEPH, and JUSTINE VOONG, |    **UNDER THE LANHAM ACT** |
| 20 | |
| 21          Defendants. | **JURY TRIAL DEMANDED** |

22

23

24

25

26

27

28

---

**COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Tax Analysts, Inc. ("Tax Analysts") hereby files this Complaint against Orbitax, LLC ("Orbitax"), Gratian Joseph ("Joseph"), and Justine Voong ("Voong") (collectively "Defendants") and alleges as follows:

## NATURE OF THE ACTION

1.    This is a suit for copyright infringement and trademark infringement in violation of the Copyright Act and the Lanham Act, respectively.

2.    Plaintiff Tax Analysts is an internationally known and respected publisher of news, analysis, and commentary for tax professionals. Its extensive portfolio includes numerous publications, including Tax Notes Today International and Worldwide Tax Treaties.

3.    Tax Analysts recently became aware that Defendants, who provide a competing service, have illegally copied and republished no less than eight copyrighted registered works (the "Works") from its Tax Notes Today International publication without authorization. [*See* **Exhibits 1-8.**]

4.    Following investigation of these violations, Tax Analysts has also learned—based on information and belief—that one or more of the Defendants surreptitiously gained access to Tax Analysts' copyrighted Works by subscribing to its publications for the purpose of knowingly, intentionally, and willfully copying and republishing Tax Analysts' Works as their own.  On information and belief, these infringements are extensive and have been ongoing for some time.

5.    In addition, Defendants have infringed Tax Analysts' federally registered trademark, WORLDWIDE TAX TREATIES.  [*See* **Exhibit 9**.]

6.    Accordingly, Tax Analysts brings this suit to enjoin Defendants' intentional and willful violations of the Copyright Act and the Lanham Act and to recover monetary damages, exemplary damages, and any other relief to which it is justly entitled.

**THE PARTIES**

7.    Tax Analysts is a District of Columbia nonprofit with its principal place of business located at 400 South Maple Ave, Suite 400, Falls Church, Virginia 22046.

8.    Upon information and belief, Defendant Orbitax, LLC is a California limited liability corporation with its principal place of business located at 217 Sunset Court, Pacifica, California, 94044.

9.    Upon information and belief, Defendant Gratian Joseph is an individual residing in California and can be served at his residence at 217 Sunset Court, Pacifica, California, 94044.

10.    Upon information and belief, Defendant Justine Voong is an individual residing in California and can be served at her residence at 217 Sunset Court, Pacifica, California, 94044.

**JURISDICTION AND VENUE**

11.    The Court has original and exclusive subject matter jurisdiction over these claims pursuant to 28 U.S.C. §§ 1331 and 1338(a), because this Complaint states claims arising under the Copyright Act of 1976, 17 U.S.C., § 101, *et seq.*, and The Lanham Act.

12.    The Court has personal jurisdiction over Defendant Orbitax, because it is a California limited liability company with its principal place of business at 217 Sunset Court, Pacifica, California, 94044, within this Judicial District.  Orbitax systematically and continuously conducts business in California, including maintaining its corporate headquarters, employing staff, and providing tax information services to California customers.

13.    On information and belief, Defendant Joseph resides in California within this Judicial District and, as CEO and Co-Founder of Orbitax, he regularly conducts business in California, including but not limited to directing Orbitax's operations from its California headquarters.  Upon information and belief, Joseph makes significant

business decisions for Orbitax from California, including decisions regarding content creation, publication, and the use of intellectual property.

14.    On information and belief, Defendant Voong resides in California within this Judicial District and, upon information and belief, accessed Tax Analysts' subscription content from her California residence for the purpose of providing that content to Orbitax for unauthorized copying and republication.

15.    On information and belief, the infringing activities that form the basis of this action occurred in California, as Defendants accessed, copied, and republished Tax Analysts' copyrighted works from their California locations and through California-based computer systems and servers.

16.    On information and belief, Defendants' infringing publications were made available to and accessed by California residents through Orbitax's website, which specifically targets California tax professionals among its customer base.

17.    Defendants' unauthorized use of Tax Analysts trademark WORLDWIDE TAX TREATIES  was displayed on Orbitax's website, which is operated from California and specifically markets services to California residents and businesses.

18.    Thus, the Court's exercise of jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice because Defendants have established minimum contacts with the forum with respect to both general and specific jurisdiction.

19.    Venue in this District is proper pursuant to 28 U.S.C. §§ 1391 & 1400 because Defendants reside in this District, and all or a substantial portion of the events giving rise to this suit occurred in this District.

## FACTUAL BACKGROUND

### A.  Tax Analysts: A Premier Provider of Tax Information Services

20.    Tax Analysts is an internationally known and respected publisher of news, analysis, and commentary for tax professionals.

21. Founded in 1970, Tax Analysts has issued extensive periodic journals, featuring news, commentary, and analysis on federal taxation. The Tax Analysts portfolio of publications includes Tax Notes Federal, Tax Notes State, and Tax Notes International, as well as the online daily news services Tax Notes Today Federal, Tax Notes Today International, Tax Notes Today State, and Worldwide Tax Treaties (collectively the "Tax Notes Publications").

22. Each publication provides best-in-class commentary and analysis on the latest changes in tax law and policy, as well as on court opinions, legislative action, and revenue rulings. The publications are relied upon by tax practitioners worldwide. Additionally, the time-sensitive nature of the tax publications creates significant commercial value, because, for example, the subscribers rely on receiving this information before their competitors.

23. To produce and publish its industry-leading content, Tax Analysts employs dozens of professionals, and contracts with hundreds more, to create original and proprietary content for its subscribers. Tax Analysts' Tax Notes Publications are highly valued and generate substantial revenue for its subscribers.

24. Tax Analysts' articles and publications are available to registered subscribers who are provided access to Tax Analysts' content subject to strict license restrictions. As explained below, subscribers to Tax Analysts' content (including the Works) are strictly prohibited from reproduction, distribution, and republication of Tax Analysts' content.

**B.    Defendant Orbitax and Its Leadership**

25. Defendant Orbitax is a competing tax news service.

26. Upon information and belief, Defendant Joseph is the Co-Founder and Chief Executive Officer of Orbitax.

27. Upon information and belief, Defendant Voong is the wife of Defendant Joseph.

28.     On information and belief, as CEO, Joseph exercises operational control over Orbitax's business activities, including but not limited to: (1) directing the company's content creation and publication strategies; (2) supervising and approving content published under the Orbitax brand; (3) establishing and enforcing company policies regarding intellectual property use; (4) making final decisions regarding the sources and methods of obtaining content for Orbitax publications; and (5) personally benefiting financially from Orbitax's business operations through his ownership interest.

29.     Upon information and belief, Joseph personally directed, supervised, approved, and/or acquiesced to the systematic copying and republication of Tax Analysts' copyrighted works as part of a deliberate business strategy to compete with Tax Analysts while avoiding the substantial costs of creating original content. Joseph's control over Orbitax operations is further evidenced by his marital relationship with Defendant Voong, who maintained a subscription to Tax Analysts' content that served as the conduit through which Tax Analysts' copyrighted works were accessed for unauthorized copying and republication by Orbitax.

30.     Upon information and belief, Joseph was personally aware of, and/or deliberately orchestrated, the unauthorized copying of Tax Analysts' copyrighted works and trademark through his position as CEO, his direct supervision of Orbitax's content publication, and his coordination with Defendant Voong to access Tax Analysts' subscription-based content for improper commercial purposes.

C.     **Tax Analysts' Intellectual Property**

31.     Between July 19 and July 24, 2024, Tax Analysts authored eight original copyrighted Works as published in its "Tax Notes Today International" daily news service. Specifically, the Works include:

| | Publication | U.S Copyright Registration No. | Copyright Registration Date |
|---|---|---|---|
| 1. | "Colombia, Zimbabwe Mulling Changes to Minimum Tax Rules" | TX0009419307 | August 18, 2024 |
| 2. | "Andorran Cabinet Authorizes Signing of Tax Treaty with Latvia" | TX0009418866 | August 18, 2024 |
| 3. | "France Publishes Guidance on Termination of Tax Treaty With Burkina Faso" | TX0009419317 | August 18, 2024 |
| 4. | "Chile and Paraguay Initial Revision to Tax Treaty" | TX0009419332 | August 18, 2024 |
| 5. | "Mauritius Investment Firm Not Liable for Indian Capital Gains Tax" | TX0009419305 | August 18, 2024 |
| 6. | "Turkey and Zambia Initial Tax Treaty" | TX0009419315 | August 18, 2024 |
| 7. | "Angola's Parliament Approves Tax Treaty With Rwanda" | TX0009419326 | August 18, 2024 |
| 8. | "Kuwaiti Cabinet Approves Tax Treaty With UAE" | TX0009419319 | August 18, 2024 |

[*See* **Exhibits 1-8**]. Tax Analysts' Works are original works of authorship and have valid U.S. copyright registrations.

32. Tax Analysts is also the owner of the trademark WORLDWIDE TAX TREATIES U.S. Registration No. 4,587,081 (hereinafter "Tax Analysts Trademark") which has achieved incontestable status and cannot be challenged as merely descriptive. [**Exhibit 9**].

**D. Defendants' Infringement of Tax Analysts Intellectual Property**

33. On July 24 and July 25, shortly after the Works' publication, Defendant Orbitax substantially copied the Works without authorization in their entirety and republished them in the "Orbitax Tax News report."

34. Copies of the infringing works as copied and republished by Defendant Orbitax in the Orbitax Tax News Reports on July 24th and 25th of 2024 are attached hereto as **Exhibits 10-11**.

35.     A comparison of Tax Analysts' Works with the infringing works confirm that one or more Defendants literally copied the Works nearly verbatim.  The following table illustrates but a few examples of nearly verbatim copyright infringement:

| Tax Analyst Publication: Tax Notes | Orbitax Infringing Publication |
|---|---|
| "Andorra's Executive Council has authorized the signing of an income tax treaty with Latvia, according to information published July 17 by the Andorran government. The treaty, which is expected to be signed later this year, would be the first agreement of its kind between the two countries. It must be signed and ratified by both contracting parties before entering into force." <br><br> (July 19, 2024) <br><br> Title:  Andorran Cabinet Authorizes Signing of Tax Treaty With Latvia <br><br> **[Exhibit 2]** | "Andorra's Executive Council has authorized the signing of an income tax treaty with Latvia, according to information published July 17 by the Andorran government. The treaty, which is expected to be signed later this year, would be the first of its kind between the two countries and must be signed and ratified by both contracting parties before entering into force." <br><br> (July 24, 2024) <br><br> Title:  Andorran Cabinet Authorizes Signing of Tax Treaty With Latvia <br><br> **[Exhibit 10]** |
| "France's Ministry for Europe and Foreign Affairs announced previously that it would consider the treaty terminated from January 1, 2025, and that both countries would cease to apply its provisions from November 8, 2023. … The guidance also states that mutual agreement procedure under the treaty is no longer applicable after November 8, 2023, and cases unresolved as of that date will be considered closed." | "France's Ministry for Europe and Foreign Affairs announced previously that it would consider the treaty terminated from 1 January 2025, and that both countries would cease to apply its provisions from 8 November 2023. … The guidance also states that mutual agreement procedure under the treaty is no longer applicable after 8 November 2023, and cases unresolved as of that date will be considered closed." |

| (July 19, 2024) | (July 24, 2024) |
|---|---|
| Title: France Publishes Guidance on Termination of Tax Treaty with Burkina Faso **[Exhibit 3]** | Title: France Publishes Guidance on Termination of Tax Treaty with Burkina Faso **[Exhibit 10]** |

36.    Upon information and belief, Defendants also copied and published the Works for a commercial purpose and without authorization.

37.    Based on information and belief, Defendants' improper infringement of other copyrighted material extends well beyond the Works published in July 2024 and is believed to have been ongoing for several years.  For example, at least two more original works of authorship by Tax Analysts were subsequently infringed by Orbitax as evidenced by the following table:

| **Tax Analyst Publication: Tax Notes** | **Orbitax Infringing Publication** |
|---|---|
| "The World Bank has set out a framework to help countries evaluate their options for implementing multilaterally agreed global minimum taxation rules, urging them to 'take concrete steps' in preparing for change." (Sept. 27, 2022) Source: https://www.taxnotes.com/tax-notes-today-international/tax-policy/countries-must-prepare-global-minimum-taxation-world-bank-says/2022/09/27/7f6b3 | "The World Bank has set out a framework to help countries evaluate their options for implementing multilaterally agreed global minimum taxation rules, urging them to 'take concrete steps' in preparing for change." (Oct. 3, 2022) Source: https://orbitax.com/news/archive.php/World-Bank-Report-Urges-Countr-50966 |
| "Tax commissioners from around the world agreed to ramp up work on ways to streamline | "Tax commissioners from around the world agreed to ramp up work on ways to streamline |

| implementation of OECD-brokered two-pillar global tax reform rules to enhance tax certainty and ease administrative burdens." (Oct. 3, 2022) Source: https://www.taxnotes.com/tax-notes-today-international/tax-system-administration/tax-chiefs-vow-focus-global-tax-reform-administration/2022/10/03/7f6sq | implementation of OECD-brokered two-pillar global tax reform rules to enhance tax certainty and ease administrative burdens." (Oct. 3, 2022) Source: https://orbitax.com/news/archive.php/Country-Tax-Commissioners-to-R-50967 |

38.    Tax Analysts also discovered during the course of its recent investigation that Defendant Orbitax has improperly infringed the Tax Analysts Trademark.

39.    In particular, Defendant Orbitax's website uses "Worldwide Tax Treaties" as an identifier linking to Orbitax's own database, trading on the recognition and goodwill of the Tax Analysts Trademark without authorization, and suggesting the Orbitax database is associated with, or sponsored by, Tax Analysts when it is not. [*See* **Exhibit 12**.]

**E.    The Subscription Scheme**

40.    During its investigation into the infringement of the Works, Tax Analysts discovered that Defendant Voong, the wife of Defendant Orbitax's Chief Executive Officer, Joseph, is a subscriber to Tax Analysts' content.

41.    A true and correct copy of Defendant Voong's license and subscription renewal agreement with Tax Analysts, as well as the Terms and Conditions (incorporated by reference) are attached hereto as **Exhibit 13**.

42.    The Terms and Conditions explicitly grant only a "limited, non-exclusive" right to review and reproduce content "solely in the regular course of tax and business research for you or your clients."  Defendant Voong's actions fall under the explicitly prohibited uses, which include "any other sale, reproduction, distribution,

modification, creation of derivative works of, display, republication, download, storage or transmittal of any Content." [**Exhibit 13** at p. 6.]

43.    Based on information and belief, Defendant Voong obtained Tax Analysts' proprietary and copyrighted content, including but not limited to the Works, through her subscription and license agreement with Tax Analysts.

44.    Upon information and belief, Defendant Voong intentionally obtained Tax Analysts' proprietary and copyrighted content, including but not limited to the Works, to be used for a commercial purpose and without authorization for the benefit of Defendants Orbitax and Joseph, and at the instruction, direction, and control of Defendants Orbitax and Joseph.

**F.    Notice: Tax Analysts' Attempts to Resolve the Matter**

45.    On August 1, 2024, Tax Analysts wrote to Defendant Orbitax about Orbitax's improper and extensive infringements of Tax Analysts' copyrighted content, and demanded, among things, that Orbitax immediately cease and desist from using its copyrighted materials and compensate Tax Analysts for the harm caused by all Defendants.

46.    On August 22, 2024, Tax Analysts wrote again to Defendant Orbitax, reiterating its demands related to the Defendants' infringement and providing further notice of Defendants' infringement of the Tax Analysts Trademark.

47.    The parties were unable to reach a resolution, leading to this Complaint.

**G.    Commercial Value and Damage to Tax Analysts as a Result of Willful Infringement**

48.    The commercial value of the Works is evidenced by Defendants' deliberate and willful copying of this content for their competing service, demonstrating that Defendants recognized the significant market value of Tax Analysts' content and sought to capitalize on it without incurring the substantial costs of creating original content.

49. Upon information and belief, Defendants' unauthorized copying and republication of Tax Analysts' Works has allowed Defendants to unfairly compete with Tax Analysts in the marketplace and to derive substantial revenue that rightfully belongs to Tax Analysts as the creator and copyright owner of the Works.

50. The commercial value of Tax Analysts' Works is also demonstrated by the fact that subscribers, including Defendant Voong (discussed below), willingly pay substantial subscription fees to access this content, with the understanding that reproduction and redistribution is strictly prohibited under the subscription terms.

51. As a direct and proximate result of Defendants' willful copyright and trademark infringement, Tax Analysts has suffered and continues to suffer substantial damages, including but not limited to:

a. Direct financial losses in the form of lost subscription revenue, as potential subscribers can access Tax Analysts' proprietary content through Defendants' competing services without paying for a Tax Analysts subscription;

b. Dilution of Tax Analysts' premium brand value and reputation in the marketplace, which Tax Analysts has cultivated over the course of years through substantial investment in creating high-quality, original content;

c. Loss of market share and competitive advantage, as Defendants have unfairly competed by using Tax Analysts' proprietary content without incurring the substantial costs associated with creating such content;

d. Diminished value of Tax Analysts' copyrighted works, as their exclusivity and uniqueness in the marketplace has been compromised by Defendants' unauthorized reproduction and distribution;

e. Harm to Tax Analysts' goodwill and reputation among its subscribers and potential subscribers, who may incorrectly believe that Tax

1    Analysts has authorized or is affiliated with Defendants' infringing

2    services;

3    f.    Costs associated with investigating and addressing Defendants'

4    infringement, including internal resources diverted from Tax

5    Analysts' core business operations;

6    g.    Confusion in the marketplace regarding the source of tax information

7    services, particularly with respect to Defendants' unauthorized use of

8    Tax Analysts' registered trademark WORLDWIDE TAX TREATIES;

9    h.    Unjust enrichment of Defendants, who have profited from Tax

10    Analysts' intellectual property;

11    i.    Ongoing and future damages, as upon information and belief

12    Defendants continue to exploit Tax Analysts' intellectual property and

13    as the full scope of Defendants' past infringements is discovered; and

14    j.    Irreparable harm to Tax Analysts' business model, which relies on

15    subscription revenue from its proprietary content that Defendants

16    have systematically misappropriated.

17    52.    The full extent of damages will be proven at trial, with the likelihood of

18    substantial additional damages as the full scope of Defendants' infringement is

19    uncovered through discovery.

20    **<u>FIRST CAUSE OF ACTION</u>**
**COPYRIGHT INFRINGEMENT**
21    **(Against Defendants)**

22    53.    Tax Analysts incorporates by reference the previous Paragraphs herein.

23    54.    By its actions alleged herein, Defendants have infringed and continued to

24    infringe on Tax Analysts' federally registered copyrighted Works.    Specifically,

25    Defendants have used and continue to use without authorization the Works, thereby

26    infringing on Tax Analysts' exclusive rights under 17 U.S.C. §106.

27

28

55. Moreover, during its recent investigation, Tax Analysts uncovered information demonstrating that the Defendants' improper use and disclosure of other copyrighted material extends well beyond the Works recently published in July 2024 and has been extensive and ongoing for several years.

56. Upon information and belief, Defendant Joseph exercises control at Defendant Orbitax, and in coordination with Defendant Voong, determined and/or directed the policies that led to the infringements complained of herein. Accordingly, Defendants Joseph and Voong are jointly and severally liable for direct copyright infringement.

57. Upon information and belief, Defendant Joseph maintained the right and/or ability to control the infringing activities of Defendant Orbitax and Defendant Voong and had a direct financial interest in those activities by virtue of his ownership in the company and the substantial benefits derived from use of the Works. Accordingly, Defendant Joseph is vicariously liable for copyright infringement.

58. Accordingly, Defendants' exploitation of a Tax Analysts' subscription to obtain Tax Analysts' content, and the verbatim and repeated nature of the copying of the Works, sometimes immediately after publication by Tax Analysts, demonstrate deliberate and willful infringement, performed with actual knowledge inasmuch as they knew, or had reason to know, that their actions constituted copyright infringement; and/or because they acted with reckless disregard to same.

59. As a result of the foregoing, Tax Analysts is entitled to actual damages and/or enhanced statutory damages, plus attorney's fees and costs, for which Defendants are liable. *See* 17 U.S.C. §§ 504 & 505.

60. Tax Analysts believes that it will likely continue to be damaged by Defendants' actions.

**SECOND CAUSE OF ACTION**
**LANHAM ACT VIOLATIONS**
**(Against Defendants)**

61.    Tax Analysts incorporates by reference the previous Paragraphs herein.

62.    Tax Analysts has a valid U.S. trademark WORLDWIDE TAX TREATIES – U.S. Registration No. 4,587,081. Tax Analysts' trademark has achieved uncontestable status and cannot be challenged as merely descriptive.

63.    Defendants' unlawful and unauthorized use of the Tax Analysts Trademark in connection with Defendant Orbitax's goods and services causes confusion and/or is likely to cause confusion or mistake in violation of the Lanham Act. *See* 15 USC § 1114 (1).

64.    Moreover, Defendants have used false and misleading descriptions of fact and false and misleading representations of fact, in commercial advertising and promotions that misrepresent the nature, characteristics, qualities, and origin of Defendant Orbitax's services. *See* 15 USC § 1125(a)(1)(B).

65.    Defendants have represented that the Tax Analysts Trademark, Works, and services are their own when in reality they belong to Tax Analysts.

66.    Tax Analysts has been damaged by Defendants' actions, and Defendants have been unjustly enriched by using the Tax Analysts Trademark under Defendant Orbitax's branding.

67.    Tax Analysts has been damaged, and believes it will likely continue to be damaged, by Defendants' actions and statements.

68.    Tax Analysts is entitled to recover damages including 1) Defendants' profits, (2) any damages sustained by the Tax Analysts, and (3) costs. *See* 15 USC § 1117(a).

69.    Defendants' actions constitute willful infringement inasmuch as they knew, or had reason to know, that their actions constituted trademark infringement;

and/or because they acted with reckless disregard to the same. Accordingly, Tax Analysts is entitled to treble damages and attorney's fees. *See* 15 USC § 1117(b).

**JURY DEMAND**

70.    Tax Analysts hereby demands a jury on all issues so triable.

**REQUEST FOR RELIEF**

71.    WHEREFORE, Tax Analysts respectfully requests the following relief:

a.  That Defendants be found liable on all claims;

b.  An order that Defendants and all persons under their direction, control, permission or authority:

i.  Immediately cease and desist from any further reproduction, distribution, display, or other use of Tax Analysts' copyrighted works, including but not limited to the eight registered Works identified in this Complaint and any other Tax Analysts content;

ii.  Immediately cease and desist from any further use of Tax Analysts' registered trademark WORLDWIDE TAX TREATIES or any confusingly similar marks;

iii.  Remove and permanently delete all infringing content from all Orbitax websites, databases, servers, cloud storage, and any other digital or physical repositories under Defendants' control;

iv.  Destroy all physical copies of infringing materials in Defendants' possession, custody, or control;

v.  Provide written certification, under penalty of perjury, that all infringing content has been removed and destroyed within 30 days of the Court's order;

vi.  Implement technological measures to prevent future unauthorized access to Tax Analysts' subscription-based content,

including terminating any subscriptions held by Defendants or their affiliates;

vii. Provide Tax Analysts with a complete accounting of all infringing content that has been copied, reproduced, distributed, or otherwise used by Defendants;

viii. Provide Tax Analysts with a complete list of all customers or subscribers who received or accessed the infringing content;

ix. Issue corrective communications to all customers or subscribers who received or accessed the infringing content, acknowledging the infringement and clarifying that the content originated from Tax Analysts;

x. Be prohibited from establishing any new business entities or operations that engage in activities similar to those at issue in this litigation for the purpose of circumventing the Court's injunction;

c. For each work infringed, an award of actual damages and/or statutory damages under 17 U.S.C. § 504(c);

d. An award to Tax Analysts of its reasonable costs and attorney's fees under 17 U.S.C. § 505 and 1203(b)(4) & (5);

e. For violations of the Lanham Act, an award of actual damages, profits and costs under 15 USC § 1117(a);

f. Treble damages and attorney's fees pursuant to 15 USC § 1117(b);

g. Pre-judgment and post-judgment interest as allowed by law; and

h. All such other and further relief, both at law and in equity, which this Court deems just and proper.

Dated: May 21, 2025                    LONDON & NAOR, P.C.

                                       */s/ Ellen London*
                                       ELLEN LONDON

1    Dated: May 21, 2025                    WITTLIFF CUTTER, PLLC

2                                           */s/ Nicole M. Norris*
                                           NICOLE M. NORRIS

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COMPLAINT**

EXHIBIT 1

EXHIBIT 1
Page 1

# Colombia, Zimbabwe Mulling Changes to Minimum Tax Rules

POSTED ON JULY 19, 2024

The Colombian and Zimbabwean governments are considering whether they need to amend their corporate minimum tax regimes to bring them into closer alignment with the OECD global anti-base-erosion (GLOBE) rules.

Colombia made the decision to adopt its own 15 percent domestic minimum top-up tax before the OECD published the GLOBE model rules, according to Andrea del Pilar Prieto, international taxation adviser at Colombia's National Directorate of Taxes and Customs. However, the government is reviewing GLOBE administrative guidance and assessing the initial results of applying the minimum tax as it considers its reaction to new developments, she added. Prieto spoke during a July 18 webcast organized by the International Institute for Sustainable Development.

Colombia is not rushing to implement the GLOBE rules — the income inclusion rule and the undertaxed profits rule — because they are not OECD minimum standards and because Colombia doesn't have many multinational enterprises that would be in scope of the rules, Prieto said.

"For these reasons, we are taking . . . time to assess how best to proceed with these rules, because this merits a serious cost-benefit analysis, and we also want to see and reflect on what will be the effects after the implementation of IIRs, UTPRs, and [qualified domestic minimum top-up taxes] by European countries and other key partners," Prieto added.

Colombia is in the majority of jurisdictions in the OECD inclusive framework on base erosion and profit shifting that struck a political agreement in October 2021 on a two-pillar plan to overhaul the international corporate tax system. Pillar 2 consists of the GLOBE rules, which ensure that large MNEs are subject to an effective tax rate of 15 percent wherever they operate.

However, Colombia enacted a tax reform law in December 2022 that includes several measures, including a GLOBE-rule-inspired 15 percent domestic minimum top-up tax, calculated using financial profits. The tax applies to Colombian companies, although some types of companies, like those with special economic zone status, are exempt.

Colombia also participates in the ad hoc committee responsible for drafting the terms of reference for a U.N. framework convention on international tax cooperation. Although it's possible that the taxation of the digitalized and globalized economy will be a key agenda item in the convention, global minimum taxation doesn't appear to be a priority, according to Prieto. The inclusive framework reached a robust multilateral agreement on global minimum taxation, so it has already become a reality, not only for members but also for nonmembers, she added.

Zimbabwe is not an inclusive framework member, but the government pressed ahead with its own domestic minimum top-up tax anyway, according to Mathias Chinanayi, head of technical services at the Zimbabwe Revenue Authority.

The 15 percent tax was introduced in Finance Act 2023 (No. 13 of 2023) and took effect January 1. The government is getting assistance from organizations like the African Tax Administration Forum to see how the tax can be improved to be consistent with the GLOBE rules within the limits of Zimbabwe's laws, Chinanayi said.

Chinanayi noted that Zimbabwe's minimum tax legislation doesn't have the GLOBE rules' €750 million threshold. There are ongoing debates about whether the law should be amended to add that threshold because if it is, there will be fewer in-scope taxpayers, he added.

Papua New Guinea, an inclusive framework member, is still considering whether to adopt the GLOBE rules because they could reduce the effectiveness of some of the country's tax incentives, according to Sam Loi, commissioner of taxation at Papua New Guinea's Internal Revenue Commission. The government is also mulling whether global minimum tax rules would conflict with investment agreements, he added.

However, preliminary estimates suggest that Papua New Guinea could stand to gain $140 million from the rules, Loi said, without noting whether that is an annual estimate. "In terms of revenue take, that would be quite a significant amount," he said.

Loi said Papua New Guinea has "requested some expert advice . . . we've taken some proactive steps by speaking with our policy team, and we've already had initial conversations in terms of the impact of [global minimum taxes] and adopting the GLOBE rules," especially a qualified domestic minimum top-up tax. The government is close to making a decision, he added.

---

## ⓘ DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | COLOMBIA   ZIMBABWE   PAPUA NEW GUINEA |
| SUBJECT AREAS/TAX TOPICS | CORPORATE TAXATION   LEGISLATION AND LAWMAKING   OECD PILLAR 2 (GLOBAL MINIMUM TAX)   POLITICS OF TAXATION   TAX POLICY   TAX REFORM |
| AUTHORS | STEPHANIE SOONG |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2024-20772 |
| TAX ANALYSTS ELECTRONIC CITATION | 2024 TNTI 138-2 |

# EXHIBIT 2

EXHIBIT 2
Page 1



# Andorran Cabinet Authorizes Signing of Tax Treaty With Latvia

POSTED ON JULY 19, 2024

Andorra's Executive Council has authorized the signing of an income tax treaty with Latvia, according to information published July 17 by the Andorran government.

The treaty, which is expected to be signed later this year, would be the first agreement of its kind between the two countries. It must be signed and ratified by both contracting parties before entering into force. (Prior coverage.)

## ⓘ DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | ANDORRA    LATVIA |
| SUBJECT AREAS/TAX TOPICS | TREATIES |
| AUTHORS | ERIC EMMONS |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2024-20699 |
| TAX ANALYSTS ELECTRONIC CITATION | 2024 TNTI 138-7 |

# EXHIBIT 3

7/29/24, 1:36 PM
France Publishes Guidance on Termination of Tax Treaty With Burkina Faso | Tax Notes
Case 3:25-cv-04353-LB Document 1 Filed 05/21/25 Page 26 of 81

# France Publishes Guidance on Termination of Tax Treaty With Burkina Faso

POSTED ON JULY 19, 2024

The French General Directorate of Public Finances on July 17 published guidance for the treatment of income paid between residents of Burkina Faso and France following the decision to terminate the countries' income and inheritance tax treaty. France's Ministry for Europe and Foreign Affairs announced previously that it would consider the treaty terminated from January 1, 2025, and that both countries would cease to apply its provisions from November 8, 2023.

The guidance notes circumstances in which various types of income — including dividends, interest, royalties, capital gains, business profits, income from employment, and pensions and annuities — may still be covered by the treaty, even if the income was paid after November 8, 2023. Income no longer covered by the treaty will be taxed according to domestic law.

The guidance also states that mutual agreement procedure under the treaty is no longer applicable after November 8, 2023, and cases unresolved as of that date will be considered closed.

The treaty was signed August 11, 1965, in Ouagadougou and entered into force in 1967. It was amended by a protocol signed in 1971.

---

ℹ **DOCUMENT ATTRIBUTES**

| | |
|---|---|
| JURISDICTIONS | BURKINA FASO   FRANCE |
| SUBJECT AREAS/TAX TOPICS | BENEFITS AND PENSIONS   CAPITAL GAINS AND LOSSES |
| | DIVIDENDS   ESTATE, GIFT, AND INHERITANCE TAXES |
| | INCOME   INTEREST INCOME   PROFITS TAXATION |
| | ROYALTIES   SETTLEMENTS AND DISPUTE RESOLUTION |
| | TREATIES   WITHHOLDING |

| AUTHORS | ERIC EMMONS |
| --- | --- |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2024-20771 |
| TAX ANALYSTS ELECTRONIC CITATION | 2024 TNTI 138-10 |

# EXHIBIT 4

# Chile and Paraguay Initial Revision to Tax Treaty

POSTED ON JULY 19, 2024

Representatives of Chile and Paraguay on July 17 initialed a revision to update the countries' income and capital tax treaty, according to a release published the same day by the Paraguayan Ministry of Foreign Affairs.

During bilateral talks in August 2020, Paraguayan officials expressed interest in updating the 2005 treaty to reflect the latest OECD standards. (Prior coverage.) This would be the first update to the treaty, which was signed in Santiago on August 30, 2005, and has been in effect since 2009. (Spanish text.) It must be signed and ratified by both contracting parties before entering into force.

## ℹ DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | CHILE   PARAGUAY |
| SUBJECT AREAS/TAX TOPICS | TREATIES |
| AUTHORS | LARISSA HOAGLUND |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2024-20741 |
| TAX ANALYSTS ELECTRONIC CITATION | 2024 TNTI 138-9 |

# EXHIBIT 5

# Mauritius Investment Firm Not Liable for Indian Capital Gains Tax

POSTED ON JULY 22, 2024

A Mauritius-based investment firm does not owe tax on long-term capital gains from the transfer of shares in Indian companies because the firm was engaging in genuine business activity.

In its July 18 order in *India Property (Mauritius) Company II v. ACIT*, the Delhi "D" bench of the Income Tax Appellate Tribunal (ITAT) ruled in favor of the investment firm and set aside a February 2023 final assessment order passed by the assistant commissioner of income tax for the 2018-2019 assessment year. The ITAT held that the investment firm is entitled to claim a capital gains tax exemption under article 13(4) of the India-Mauritius income tax treaty because the purpose of establishing the firm was to attract foreign investments in India.

Article 13(4) provides that a resident country has jurisdiction to tax capital gains from the sale, exchange, or transfer of shares. Therefore, a Mauritius resident receiving capital gains derived from the sale of shares in an Indian company would be subject to tax in Mauritius.

India Property (Mauritius) Company II — established as an investment fund held by India Property Mauritius Company I, formerly JP Morgan Indian Property Mauritius Company I — transferred shares in Indian companies that gave rise to INR 1.5 billion (about $18 million) in long-term capital gains.

Following an inquiry into the firm's return, the tax authorities rejected its claim for treaty benefits and demanded INR 257 million in unpaid tax. They said the company was established in Mauritius for the sole purpose of receiving treaty benefits, adding that it was "a mere conduit entity without any economic substance."

The firm's challenge of the tax authorities' determination was dismissed by the dispute resolution panel. The firm then appealed to the ITAT, which considered the duration of the holding period of the investments and said the investments that gave rise to capital gains were held for five years before the transfer.

The ITAT also rejected the tax authorities' argument that the firm's activities were not genuine business activities because the directors were not Mauritius residents and did not incur business expenses, including the payment of director salaries. The ITAT explained that the company had in fact contracted with an external service provider to handle the day-to-day activities and make payments.

It is left to the wisdom and discretion of the company how its day-to-day activities are managed, the ITAT said. The Department of Revenue cannot question the genuineness of an assessee's business operations without establishing that administrative activities are being shown on a sham basis, it said.

The appellant in *India Property (Mauritius) Company II v. ACIT*, ITA No. 1020/Del/2023, was represented by Ajay Vohra and Divyanshu Aggarwal.

### ℹ DOCUMENT ATTRIBUTES ▾

| | |
|---|---|
| JURISDICTIONS | INDIA |
| SUBJECT AREAS/TAX TOPICS | CAPITAL GAINS AND LOSSES    CORPORATE TAXATION    JURISDICTION TO TAX    LITIGATION AND APPEALS    TREATIES |
| AUTHORS | KIARRA M. STROCKO |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2024-20975 |
| TAX ANALYSTS ELECTRONIC CITATION | 2024 TNTI 139-7 |

# EXHIBIT 6

# Turkey and Zambia Initial Tax Treaty

POSTED ON JULY 23, 2024

Officials from Turkey and Zambia have initialed an income tax treaty following a second round of negotiations, according to a July 22 release by the Turkish Revenue Administration.

The negotiations were held July 17-18 in Ankara and were led by officials from the Turkish Revenue Administration and Zambia's Ministry of Finance and National Planning.

This would be the first agreement of its kind between Turkey and Zambia. It must be signed and ratified by both contracting parties before entering into force. (Prior coverage.)

## ⓘ DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | TURKEY    ZAMBIA |
| SUBJECT AREAS/TAX TOPICS | TREATIES |
| AUTHORS | ERIC EMMONS |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2024-21089 |
| TAX ANALYSTS ELECTRONIC CITATION | 2024 TNTI 140-8 |

# EXHIBIT 7

EXHIBIT 7
Page 1



# Angola's Parliament Approves Tax Treaty With Rwanda

POSTED ON JULY 23, 2024

The Angolan National Assembly on July 19 approved for ratification the income tax treaty with Rwanda, according to a release published on its website.

The treaty was signed April 15, 2022, in Kigali. It stipulates that dividends, interest, royalties, and fees for technical services are taxable at a top rate of 10 percent. Both countries generally use the credit method to eliminate double taxation.

This is the first agreement of its kind between the two countries. It will enter into force upon the exchange of ratification instruments, and its provisions will apply from January 1 of the year following entry into force. Rwanda ratified the agreement in July 2022.

---

ℹ **DOCUMENT ATTRIBUTES**                                                    ▾

| | |
|---|---|
| JURISDICTIONS | ANGOLA    RWANDA |
| SUBJECT AREAS/TAX TOPICS | DIVIDENDS    FOREIGN TAX CREDIT    INTEREST INCOME    ROYALTIES    TREATIES    WITHHOLDING |
| AUTHORS | CAMERON DRESDNER |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2024-21087 |
| TAX ANALYSTS ELECTRONIC CITATION | 2024 TNTI 140-7 |

# EXHIBIT 8

EXHIBIT 8
Page 1

# Kuwaiti Cabinet Approves Tax Treaty With UAE

**POSTED ON JULY 24, 2024**

The Kuwaiti Council of Ministers on July 8 issued a decree approving for ratification the income and capital tax treaty with the United Arab Emirates, according to information published on Kuwait's online legal portal.

The treaty was signed February 11 in Dubai. (Arabic text.) It stipulates that dividends and interest are taxable only in the beneficial owner's state of residence, while royalties and fees for technical services are taxable at a top rate of 10 percent. Both countries generally use the credit method to eliminate double taxation.

This is the first agreement of its kind between the two countries. It will enter into force upon the exchange of ratification instruments, and its provisions will generally apply from January 1 of the year following entry into force.

## ⓘ DOCUMENT ATTRIBUTES

| | |
|---|---|
| JURISDICTIONS | KUWAIT    UNITED ARAB EMIRATES |
| SUBJECT AREAS/TAX TOPICS | DIVIDENDS    EXEMPTIONS AND DEDUCTIONS<br>FOREIGN TAX CREDIT    INTEREST INCOME    ROYALTIES<br>TREATIES    WITHHOLDING |
| AUTHORS | ERIC EMMONS |
| INSTITUTIONAL AUTHORS | TAX ANALYSTS |
| TAX ANALYSTS DOCUMENT NUMBER | DOC 2024-21225 |
| TAX ANALYSTS ELECTRONIC CITATION | 2024 TNTI 141-11 |

EXHIBIT 9



# United States of America

## United States Patent and Trademark Office

# Worldwide Tax Treaties

**Reg. No. 4,587,081**

**Registered Aug. 19, 2014**

**Int. Cl.: 35**

**SERVICE MARK**

**PRINCIPAL REGISTER**

TAX ANALYSTS (D.C. CORPORATION)
SUITE 400
400 S. MAPLE AVENUE
FALLS CHURCH, VA 22046

FOR: ONLINE COMPUTER DATABASE IN THE FIELD OF TAX AND TAX TREATIES, IN CLASS 35 (U.S. CLS. 100, 101 AND 102).

FIRST USE 10-31-1997; IN COMMERCE 10-31-1997.

THE MARK CONSISTS OF STANDARD CHARACTERS WITHOUT CLAIM TO ANY PAR-TICULAR FONT, STYLE, SIZE, OR COLOR.

OWNER OF U.S. REG. NO. 2,914,556.

SEC. 2(F).

SER. NO. 85-958,743, FILED 6-13-2013.

ANDREA BUTLER, EXAMINING ATTORNEY



**Deputy Director of the United States**
**Patent and Trademark Office**

---

**REQUIREMENTS TO MAINTAIN YOUR FEDERAL
TRADEMARK REGISTRATION**

**WARNING: YOUR REGISTRATION WILL BE CANCELLED IF YOU DO NOT FILE THE
DOCUMENTS BELOW DURING THE SPECIFIED TIME PERIODS.**

---

**Requirements in the First Ten Years\***
**What and When to File:**

> *First Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) between the 5th and 6th years after the registration date. *See* 15 U.S.C. §§1058, 1141k. If the declaration is accepted, the registration will continue in force for the remainder of the ten-year period, calculated from the registration date, unless cancelled by an order of the Commissioner for Trademarks or a federal court.

> *Second Filing Deadline:* You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between the 9th and 10th years after the registration date.\*
> *See* 15 U.S.C. §1059.

**Requirements in Successive Ten-Year Periods\***
**What and When to File:**

> You must file a Declaration of Use (or Excusable Nonuse) **and** an Application for Renewal between every 9th and 10th-year period, calculated from the registration date.\*

**Grace Period Filings\***

The above documents will be accepted as timely if filed within six months after the deadlines listed above with the payment of an additional fee.

---

**The United States Patent and Trademark Office (USPTO) will NOT send you any future notice or
reminder of these filing requirements.**

---

**\*ATTENTION MADRID PROTOCOL REGISTRANTS:** The holder of an international registration with an extension of protection to the United States under the Madrid Protocol must timely file the Declarations of Use (or Excusable Nonuse) referenced above directly with the USPTO. The time periods for filing are based on the U.S. registration date (not the international registration date). The deadlines and grace periods for the Declarations of Use (or Excusable Nonuse) are identical to those for nationally issued registrations. *See* 15 U.S.C. §§1058, 1141k. However, owners of international registrations do not file renewal applications at the USPTO. Instead, the holder must file a renewal of the underlying international registration at the International Bureau of the World Intellectual Property Organization, under Article 7 of the Madrid Protocol, before the expiration of each ten-year term of protection, calculated from the date of the international registration. *See* 15 U.S.C. §1141j. For more information and renewal forms for the international registration, see http://www.wipo.int/madrid/en/.

**NOTE: Fees and requirements for maintaining registrations are subject to change. Please check the USPTO website for further information. With the exception of renewal applications for registered extensions of protection, you can file the registration maintenance documents referenced above online at** http://www.uspto.gov.

# EXHIBIT 10

# Orbitax Tax News

**Orbitax**

**Report: 24-07-2024**

## Approved Changes

**Uganda**

**Ugandan Government Enacts Amendments to Tax Laws for 2024-2025**

The government of Uganda has enacted various amendments to tax laws for 2024-2025. The various amendments were assented by the President on 15 July 2024 and have been in effect since 1 July 2024. The enacted amendments are included in the Income Tax (Amendment) Act 2024, the Tax Procedures Code (Amendment) Act 2024, the Value Added Tax (Amendment) Act 2024 and the Stamp Duty (Amendment) Act 2024 ( previous coverage (https://www.orbitax.com/news/archive.php/Ugandas-Approved-Tax-Measures-56009))

Key highlights of the amendments include the following:

- expansion of the list of tax-exempt income.
- imposition of WHT on commission paid to payment service providers.
- imposition of VAT on goods or services supplied by a taxable employer to an employee at no consideration; and
- waiver of interests and penalties, outstanding as of 30 June 2023, owed by taxpayers that pay their principal outstanding tax by 31 December 2024.

Click the following link for an overview of final tax amendments for 2024-2025 (https://ura.go.ug/wp-content/uploads/2024/06/Final-Tax-amendments-2024-25.pdf) published by the Uganda Revenue Authority.

☐ 07/24/2024

## Proposed Changes

**Colombia-Zimbabwe**

**Colombia, Zimbabwe Reviewing Domestic Minimum Tax Rules to Align with OECD Pillar 2**

The Colombian and Zimbabwean governments are considering whether they need to amend their corporate minimum tax regimes to bring them into closer alignment with the OECD global anti-base-erosion (GLOBE) rules.

Colombia who made the decision to adopt its own 15% domestic minimum top-up tax before the OECD published the GLOBE model rules, is now assessing the initial results of applying the minimum tax according to Andrea del Pilar Prieto, international taxation adviser at Colombia's National Directorate of Taxes and Customs. Colombia enacted a tax reform law in December 2022 that includes several measures, including a GLOBE-rule-inspired 15% domestic minimum top-up tax, calculated using financial profits. The tax applies to Colombian companies, although some types of companies, like those with special economic zone status, are exempt. According to Prieto, Colombia is not rushing to implement the GLOBE rules — the income inclusion rule and the undertaxed profits rule — because they are not OECD minimum standards and because Colombia doesn't have many multinational enterprises that would be in scope of the rules. Rather according to Prieto "we are taking . . . time to assess how best to proceed with these rules, because this merits a serious cost-benefit analysis, and we also want to see and reflect on what will be the effects after the implementation of IIRs, UTPRs, and [qualified domestic minimum top-up taxes] by European countries and other key partners."

Zimbabwe, which is not an inclusive framework member, introduced a 15% domestic minimum top-up tax in the Finance Act 2023 (No. 13 of 2023) which took effect 1 January 2024. The government is now getting assistance from organizations like the African Tax Administration Forum to see how the tax can be modified to be consistent with the GLOBE rules within the limits of Zimbabwe's laws, according to Mathias Chinanayi, head of technical services at the Zimbabwe Revenue Authority.

---

Ready for the Pillar 2 Global Minimum Tax? Click the following link to learn more about the Orbitax Global Minimum Tax Solution (https://tinyurl.com/3hef3s89).

☐ 07/24/2024

---

# Treaty Development

### Andorra-Latvia

**Andorran Cabinet Authorizes Signing of Tax Treaty with Latvia**

Andorra's Executive Council has authorized the signing of an income tax treaty with Latvia, according to information published July 17 by the Andorran government. The treaty, which is expected to be signed later this year, would be the first of its kind between the two countries and must be signed and ratified by both contracting parties before entering into force.

☐ 07/24/2024

---

### France-Burkina Faso

**France Publishes Guidance on Termination of Tax Treaty with Burkina Faso**

On 17 July 2024, the French tax authorities published updated guidelines on the Burkina Faso - France Income, Inheritance, Registration and Stamp Tax Treaty (1965), as amended by the 1971 protocol, following the denunciation of the treaty by Burkina Faso with effect from 8 November 2023. France's Ministry for Europe and Foreign Affairs announced previously that it would consider the treaty terminated from 1 January 2025, and that both countries would cease to apply its provisions from 8 November 2023. The updated guidance notes circumstances in which various types of income including dividends, interest, royalties, capital gains, business profits, income from employment, and pensions and annuities may still be covered by the treaty, even if the income was paid after 8 November 2023. Income no longer covered by the treaty will be taxed according to domestic law. The guidance also states that mutual agreement procedure under the treaty is no longer applicable after 8 November 2023, and cases unresolved as of that date will be considered closed.

☐ 07/24/2024

---

### India-Mauritius

**Mauritius Investment Company Not Liable for Indian Capital Gains Tax**

A Mauritius-based investment company does not owe tax on long-term capital gains from the transfer of shares in Indian companies because the company was engaging in genuine business activity. In its July 18 order in India Property (Mauritius) Company II v. ACIT, the Delhi bench of the Income Tax Appellate Tribunal (ITAT) ruled in favor of the investment company and set aside a February 2023 final assessment order passed by the assistant commissioner of income tax for the 2018-2019 assessment year. The ITAT held that the investment company is entitled to claim a capital gains tax exemption under article 13(4) of the India-Mauritius income tax treaty because the purpose of establishing the company was to attract foreign investments in India. Article 13(4) provides that a resident country has jurisdiction to tax capital gains from the sale, exchange, or transfer of shares. Therefore, a Mauritius resident receiving capital gains derived from the sale of shares in an Indian company would be exempt from Indian capital gains tax.

India Property (Mauritius) Company II established as an investment fund held by India Property Mauritius Company I, formerly JP Morgan Indian Property Mauritius. Company I transferred shares in Indian companies that gave rise to INR 1.5 billion (about USD 18 million) in long-term capital gains. Following an inquiry into the company's return, the tax authorities rejected its claim for treaty benefits and demanded INR 257 million in unpaid tax. They said the company was established in Mauritius for the sole purpose of receiving treaty benefits, adding that it was "a mere conduit entity without any economic substance."

The company's challenge of the tax authorities' determination was dismissed by the dispute resolution panel. The company then appealed to the ITAT, which considered the duration of the holding period of the investments and said the investments that gave rise to capital gains were held for five years before the transfer. The ITAT also rejected the tax authorities' argument that the company's activities were not genuine business activities because the directors were not Mauritius residents and did not incur business expenses, including the payment of director salaries. The ITAT explained that the company had in fact contracted with an external service provider to handle the day-to-day activities and make payments. In arriving at its conclusion in favor of the taxpayer, the ITAT concluded that it is left to the wisdom and discretion of the company how its day-to-day activities are managed, and The Department of Revenue cannot question the genuineness of an assessee's business operations without establishing that administrative activities are being shown on a sham basis.

☐ 07/24/2024

---

### Kenya-Switzerland

**Kenya and Switzerland Negotiating New Tax Treaty**

According to an update of 16 July 2024, published by the President of Kenya, Kenya and Switzerland continue to engage in discussions for the conclusion of a new tax treaty. Any resulting treaty would be the first of its kind directly between the two countries and must be finalized, signed, and ratified before entering into force.

☐ 07/24/2024

---

### South Korea-Turkey

**New Tax Treaty between South Korea and Turkey has Entered into Force**

The new income tax treaty between South Korea and Turkey entered into force on 21 July 2024. The treaty, signed 22 October 2021, replaces the 1983 income tax treaty between the two countries.

<ins>Taxes Covered</ins>

The treaty covers Korean income tax, corporation tax, the special tax for rural development, and local income tax. It covers Turkish income tax and corporate tax.

<ins>Residence</ins>

If a person other than an individual is considered resident in both Contracting States, the competent authorities will determine its residence for the purpose of the treaty through mutual agreement. If no agreement is reached, such person will not be entitled to claim any relief or exemption from tax provided by the treaty.

<ins>Withholding Tax Rates</ins>

- Dividends - 10% if the beneficial owner is a company directly holding at least 25% of the paying company's capital; otherwise, 15%
- Interest - 10%
- Royalties - 10%

<ins>Capital Gains</ins>

The following capital gains derived by a resident of one Contracting State may be taxed by the other State:

- Gains from the alienation of immovable property situated in the other State;
- Gains from the alienation of movable property forming part of the business property of a permanent establishment in the other State; and
- Gains from the alienation of shares deriving more than 50% of their value directly or indirectly from immovable property situated in the other State.

Gains from the alienation of other property by a resident of a Contracting State may generally only be taxed by that State. However, it is further provided that such other gains derived from the other State may be taxed in that State if the time period between the acquisition and alienation of the property does not exceed one year.

<ins>Double Taxation Relief</ins>

Both countries apply the credit method for the elimination of double taxation. In respect of dividends received by a Korean resident company that owns at least 25% of the voting shares or capital stock of the Turkish paying company, South Korea will also provide a credit for the Turkish tax payable on the profits out of which the dividends are paid.

Entitlement to Benefits

Article 28 (Entitlement to Benefits) provides that a benefit under the treaty shall not be granted in respect of an item of income if it is reasonable to conclude, having regard to all relevant facts and circumstances, that obtaining that benefit was one of the principal purposes of any arrangement or transaction that resulted directly or indirectly in that benefit, unless it is established that granting that benefit in these circumstances would be in accordance with the object and purpose of the relevant provisions of the treaty.

Effective Date

The treaty applies from 1 January 2025.

☐ 07/24/2024

---

| **Turkey-Zambia** |
|---|

**Turkey and Zambia Initial Tax Treaty**

According to a press release of 22 July 2024, by the Turkish Revenue Administration, Turkey and Zambia initialed a tax treaty on 18 July 2024, following a successful second round of negotiations held in Ankara from 17 to 18 July 2024. The treaty will be the first of its kind between the two countries and must be signed and ratified before entering into force.

☐ 07/24/2024

---

EXHIBIT 11

# Orbitax Tax News

**Report: 25-07-2024**

## Approved Changes

### Greece

**Greece Enacts 33% Solidarity Contribution on Profits of Energy, Mining Companies**

Greece has enacted legislation introducing a mandatory temporary solidarity contribution at a rate of 33% on companies primarily engaged in energy and mining sectors, as established in European Council Regulation (EU) 2022/1854.

The contribution is calculated as follows:

Contribution =[Taxable profits for the tax year 2023 − (120% × (1/4 × taxable profits or losses for the tax years 2018, 2019, 2020, 2021)))] × 33%

Entities may deduct the contribution as an expense when determining taxable profits for the tax year 2024.

The enacted provisions are included in Bill 5123/2024 of July 19, 2024.

☐ 07/25/2024

### India

**India Budget 2024**

**Introduction.**

The Finance Minister presented the Finance (No. 2) Bill, 2024 (the Bill) to Parliament on 23 July 2024. The Bill proposes a reduction in the corporate income tax (CIT) rate for foreign companies to 35% (from 40%), the abolition of angel tax, changes to capital gains tax rates and the removal of indexation benefits, as well as other CIT measures. The Bill will be effective once it is enacted into law.

Details of the key tax law changes are set out below.

**Personal income tax rates.**

The Finance Bill has introduced a new personal income tax regime to be effective from April 1, 2024 with the below listed tax rates becoming applicable to an individual taxpayer:

| | |
|---|---|
| Up to INR300,000 | Nil |
| INR300,001 to INR700,000 | 5% |
| INR700,001 to INR1,000,000 | 10% |
| INR1,000,001 to INR1,200,000 | 15% |
| INR1,200,001 to INR1,500,000 | 20% |
| Above INR1,500,000 | 30% |

The applicable surcharge will now be as follows:

Above INR5,000,000 but up to INR10,000,000 (including dividend income and capital gains) 10%

Above INR10,000,000 up to INR20,000,000 (including dividend income and capital gains) 15%

Above INR20,000,000 up to INR50,000,000 (excluding dividend income and capital gains) 25%

Additionally, a 4% Health and Education Cess is also levied. The above rates assume no deductions or exemptions. The final tax calculations may turn out differently if the individual is availing significant tax deductions and exemptions.

**Rationalization and simplification of capital gains tax.**

The Finance Bill proposes to rationalize and simplify the capital gains regime as set out below, to be effective from July 23, 2024:

- there will only be two holding periods: twelve months and twenty-four months, to determine whether the capital gains are long term capital gains ("LTCG") or short-term capital gains ("STCG"). For all listed securities, the holding period for LTCG will be twelve months and for all other assets, it will be twenty-four months. Therefore, the LTCG holding period for bonds, debentures, and gold will reduce from thirty-six months to twenty-four months, and for unlisted shares and immovable property, it will remain at twenty-four months.

- the rate for STCG on: (a) listed equity shares (on which securities transaction tax ("STT") has been paid); and (b) units of equity oriented mutual funds and business trusts (REITs, etc.), is proposed to be increased to 20% from the current rate of 15%. STCG on other assets will continue to be taxed at the applicable rate.

- the rate for LTCG on: (a) listed equity shares (on which securities transaction tax ("STT") has been paid); and (b) units of equity oriented mutual funds and business trusts (REITs, etc.), is proposed to be increased to 12.5% from the present rate of 10%; and

simultaneously with the rationalization of the LTCG tax rate to 12.5%, the indexation benefit available for real property, gold, and other unlisted assets is now proposed to be removed.

**Rates for deduction of income tax at source ("TDS") during the financial year 2024-25 from certain incomes for non-residents**

The Finance Bill has proposed that for non-domestic companies, the TDS on "other income" will be reduced from 40% to 35%. TDS rates for non-residents on income in the nature of capital gains will be as follows:

- LTCG on assets in case of non-resident Indians 10% (TDS for transfers taking place before July 23, 2024); 12.5% (TDS for transfers taking place after July 23, 2024)

- LTCG on unlisted securities or shares of a company not being a company in which the public are substantially interested 10% (TDS for transfers taking place before July 23, 2024); 12.5% (TDS for transfers taking place after July 23, 2024);

- LTCG arising from the transfer of a long-term capital asset being an equity share in a company or a unit of an equity-oriented fund or a unit of a business trust (on gains exceeding INR125,000); and where STT has been paid 10% (TDS for transfers taking place before July 23, 2024); 12.5% (TDS for transfers taking place after July 23, 2024);

- LTCG (not being LTCG from the transfer of capital asset, being a unit of the Unit Scheme, 1964 referred to in Schedule I to the Unit Trust of India (Transfer of Undertaking and Repeal) Act, 2002 or and being an eligible equity share in a company purchased on or after March 1, 2003 and before the March 1, 2004 20% (TDS for transfers taking place before July 23, 2024); 12.5% (TDS for transfers taking place after July 23, 2024);

- STCG on listed shares 15% (TDS for transfers taking place before July 23, 2024); 20% (TDS for transfers taking place after July 23, 2024);

**Angel tax removed**

Section 56(2)(viib) of the IT Act, popularly known as the "Angel Tax" provision, applies when a company in which the public are not substantially interested (i.e., a private company or an unlisted public company) issues shares at a premium and receives consideration that is more than the fair market value ("FMV") of the shares. The excess amount received is deemed as income from other sources in the hands of the company. The Finance Bill has proposed to do away with this provision. The amendment will take effect from April 1, 2024.

**Tax on distributed income of domestic company for buyback of shares**

The Finance Bill has proposed that the sum paid by a domestic company for purchase of its own shares shall be treated as dividend in the hands of the shareholders who receive the payment from such buyback of shares and shall be charged to income tax in their hands at the applicable rates. These amendments will take effect from October 1, 2024, and will apply to any buyback of shares that takes place on or after this date.

**Rationalization of TDS rates**

The Finance Bill provides that there are various provisions of TDS with different thresholds and multiple rates between 0.1%, 1%, 2%, 5%, 10%, 20%, 30% and above. The Finance Bill has proposed the rationalization of TDS rates as follows:

- Section 194D - Payment of insurance commission (in case of person other than company) -Proposed change from 5% to 2%  effective April 1, 2025

- Section 194DA - Payment in respect of life insurance policy -Proposed change from 5% to 2% effective October 1, 2024

- Section 194G – Commission on sale of lottery tickets- Proposed change from 5% to 2% effective October 1, 2024

- Section 194H - Payment of commission or brokerage- Proposed change from 5% to 2% effective October 1, 2024

- Section 194-IB - Payment of rent by certain individuals or HUF Proposed change from 5% to 2% effective October 1, 2024

- Section 194M - Payment of certain sums by certain individuals or Hindu undivided family- Proposed change from 5% to 2% effective October 1, 2024

- Section 194-O - Payment of certain sums by e-commerce operator to e-commerce participant- Proposed change from 1% to 0.1% effective October 1, 2024

- Section 194F relating to payments on account of repurchase of units by Mutual Fund or Unit Trust of India- Proposed to be omitted effective October 1, 2024

**Equalization Levy**

The Finance Act, 2020, provided for an equalization levy (EL) of 2% on the amount of consideration received by an e-commerce operator from e-commerce supply or services.

An "e-commerce operator" means a non-resident who owns, operates, or manages digital or electronic facility or platform for online sale of goods or online provision of services or both. The levy is imposed on the amount of consideration received from: (i) online sale of goods owned by the e-commerce operator; (ii) online provision of services provided by the e-commerce operator; (iii) online sale of goods or provision of services or both, facilitated by the e-commerce operator; or (iv) any combination of the above-mentioned activities.

The Finance Bill has proposed that the equalization levy at the rate of 2% shall not be applicable to any consideration received for e-commerce supply or services on or after August 1, 2024.

**Submission of statement by liaison office of non-resident in India**

Under Section 285 of the IT Act, a non-resident having a liaison office in India is required to prepare and deliver a statement in respect of its activities in a financial year to the tax assessing officer within sixty days from the end of such financial year. The Finance Bill has proposed that the period within which such a statement is to be filed should be prescribed under the Income-tax Rules, 1962 (the "IT Rules"). Further, to ensure better compliance in this respect, it has been proposed that a failure to furnish the statement may attract a penalty of INR1,000 for every day for which the failure continues, if the period of failure is up to three months, and INR100,000 in any other case. A new section 271GC in relation to penalties has been proposed. However, the penalty shall not be leviable if the taxpayer proves that there was reasonable cause for the failure. The amendment will be effective from April 1, 2025.

**Revision of rates of STT**

STT was introduced by the Finance (No.2) Act, 2004. Recognized stock exchanges, mutual funds (having equity-oriented scheme), insurance companies or lead merchant bankers appointed by the company in respect of an initial public offer, or an initial offer are liable to collect STT and pay the same to the credit of the Central Government within seven days from the end of the month in which STT is collected. The rates of STT have been revised from time to time. Presently, the rate of levy of STT on sale of an option in securities is 0.0625% of the option premium, while the rate of levy of STT on sale of a future in securities is 0.0125% of the price at which such "futures" are traded. Further, the rate of levy of STT on delivery trades in equity shares is 0.1% on both purchase and sale transactions, while in the case of sale of an option in securities where the option is exercised, the rate of levy is 0.125% of the intrinsic price (i.e., the difference between the settlement price and the strike price) and is payable by the purchaser. There has been exponential growth of the derivatives (futures and options) market in recent times, and trading in such derivatives accounts for a large proportion of trading on stock exchanges. In view of this exponential growth, the Finance Bill has proposed to increase the rates of STT on: (i) sale of an option in securities from 0.0625% to 0.1% of the option premium, and (ii) on sale of a futures in securities from 0.0125% to 0.02% of the price at which such futures are traded. The amendments will be effective from October 1, 2024.

**Tax incentives to International Financial Services Centre ("IFSC")**

IFSC is a jurisdiction that provides financial services to non-residents and residents, to the extent permissible under the current regulations, in any currency except the Indian Rupee. In order to incentivize operations from IFSC, the Finance Bill has proposed to expand the definition of specified funds to include retail funds and exchange-traded funds ("ETF") in IFSC, which will be tax exempt. Specified funds shall now include funds established or incorporated in India in the form of

a trust, company, limited liability partnership, or body corporate, which have been granted a certificate as a retail scheme or an ETF and are regulated under the International Financial Services Centers Authority (Fund Management) Regulations, 2022, and satisfy certain prescribed conditions. Similarly, subject to prescribed conditions, any specified income of core settlement guarantee funds that is set up by a recognized clearing corporation in the IFSC, will also be tax exempt. Section 94B of the IT Act puts in place a restriction on deduction of interest expense in respect of any debt issued by a non-resident, being an associated enterprise of the borrower. It applies to an Indian company, or a permanent establishment of a foreign company in India, who is a borrower. If such person incurs any expenditure by way of interest or of similar nature exceeding INR10,000,000 which is deductible in computing income chargeable under the head "Profits and gains of business or profession," the interest deductible shall be restricted to the extent of 30% of its earnings before interest, taxes, depreciation and amortization so as to avoid thin capitalization of a corporate entity. At present, the provisions of this section do not apply to Indian companies or permanent establishments of foreign companies which are engaged in the business of banking or insurance, or such classes of non-banking financial companies as may be notified by the Central Government. The Finance Bill has proposed that the provisions of this section shall not apply to finance companies which satisfy such conditions and carry on such activities as may be prescribed. These amendments will be effective from April 1, 2024.

**Promotion of domestic cruise ship operations by non-residents**

To promote the cruise-shipping industry in India, a presumptive taxation regime is being introduced for non-resident cruise-ship operators along with exemption on income from lease rentals if the foreign company and the non-resident cruise ship operator have the same holding company. For this purpose: (i) a new Section 44BBC is proposed which will assume that 20% of the total amount received by or paid to the non-resident cruise ship operator for passenger carriage is their profit and gains from business (subject to prescribed conditions); (ii) the existing Section 44B which governs presumptive taxation for non-resident shipping businesses will no longer apply to the cruise ship business; and (iii) through a new Section 10(15B), lease rentals paid by a company under the new (iii) through a new Section 10(15B), lease rentals paid by a company under the new Section 44BBC will be exempt from income tax for the receiving company if both are subsidiaries of the same holding company. This exemption will be available until Assessment Year 2030-31. These changes will be effective from April 1, 2025, and will apply to Assessment Year 2025- 26 and onwards. The introduction of Section 44BBC is poised to simplify tax compliance for non-resident cruise ship operators by establishing a presumptive taxation regime and providing lease rental exemptions.

**Amendment to the definition of "specified mutual funds"**

The Finance Act, 2023 introduced a special taxation regime for market-linked debentures and "specified mutual funds", as per which gains are taxed as STCG irrespective of the holding period. In this, the applicability requirement was to invest not more than 35% in equity shares. This requirement also affected other funds with less than 35% investment in equity shares, such as ETFs, gold mutual funds, and gold ETFs, and funds of funds. Now, the definition of "specified mutual funds" will be revised to cover mutual funds investing more than 65% of their total proceeds in debt and money market instruments; or (b) funds investing 65% or more of its total proceeds in units of the foregoing mutual funds. This change will take effect from April 1, 2026, and apply from Assessment Year 2026-27 onwards.

**Gifts of shares by companies no longer exempt from capital gains.**

Gifts of shares by companies will no longer be exempt from capital gains. Section 47 of the IT Act excludes transfers of capital assets via gift, will or irrevocable trust from being charged with capital gains. However, transfer of employee stock options (ESOPs) does not enjoy this exclusion. Now, in order to address tax avoidance issues, an amendment will clarify that gifts of shares by companies are not exempt from capital gains tax and only gifts, wills, or irrevocable trusts made by individuals or Hindu undivided families ("HUFs") are exempt from capital gains tax. This amendment will take effect from April 1, 2025, and will apply to the assessment year 2025- 26 and onwards.

**Amendment of withholding tax provision on sale of immovable property**

Section 194-IA of the IT Act requires tax deduction on payment of consideration for transferring certain immovable property (other than agricultural land). The current provision requires a 1% tax deduction on the consideration or the stamp duty value (whichever is higher), for immovable property transfers if the value is INR5,000,000 (the "Threshold") or more. No tax deduction is required if both consideration and stamp duty are below INR5,000,000. The current provision was being misinterpreted by taxpayers to mean that the Threshold was for consideration paid by each individual buyer, even if the total property value exceeded the Threshold. This was against legal intent so an amendment will be brought about to clarify that in case of multiple buyers or sellers, the total consideration paid by all buyers to all sellers will be considered for tax deduction purposes. This change will take effect from October 1, 2024.

**Direct Tax Vivad se Vishwas Scheme, 2024**

The IT Act provides for a mechanism of filing of appeals against orders passed under the proceedings of the IT Act, both by the taxpayer and the tax authorities before the respective appellate forums, such as Joint Commissioner of Income-tax (Appeals), Commissioner of Income-tax (Appeals), the Income-Tax Appellate Tribunals, High Courts and the Supreme Court. It has been the endeavor of the Central Board of Direct Taxes to provide expeditious disposal of appeals by appellate authorities under its administrative control. One such measure was the Direct Tax Vivaad Se Vishwas Act, 2020 launched for appeals pending as on January 1, 2020. The Scheme got a very encouraging response from the taxpayers and also resulted in garnering substantial revenue for the Indian government. The pendency of litigation at various levels has been on the rise due to a larger number of cases going for appeal than the number of disposals. Keeping in view the success of the previous Vivaad Se Vishwas Act, 2020 and the mounting pendency of appeals at CIT(A) level, the Finance Bill has proposed to introduce a Direct Tax Vivad se Vishwas Scheme, 2024 (the "Scheme") with the objective of providing a mechanism of settlement of disputed issues, thereby reducing litigation without much cost to the exchequer. It is proposed that the Scheme shall come into force from the date to be notified by the Indian government. The last date for the Scheme is also proposed to be notified.

☐ 07/25/2024

---

# Proposed Changes

| G20 |
| --- |

**Critical Pillar 1 Discussions at G20 Summit in Rio de Janeiro**

The future of the OECD Pillar 1 Amount A, which has now extended well past a June 30 deadline, will depend on discussions to be held during the Group of 20 finance leaders meeting this week.

The stakes in the negotiations are high. A failure to reach agreement on final terms could prompt several countries to reinstate their taxes on U.S. tech giants and risk punitive duties on billions of dollars in exports to the U.S.

Standstill agreements under which Washington has suspended threatened trade retaliation against seven countries -- Austria, Britain, France, India, Italy, Spain and Turkey -- expired on June 30, but the U.S. has not taken steps to impose tariffs.

Discussions on the matter are continuing. An Italian government source said that European countries were seeking assurances that the U.S. tariffs on some $2 billion worth of annual imports from French Champagne to Italian handbags and optical lenses remained frozen while the talks continue, including at the G20 meeting in Rio de Janeiro.

A European Union document prepared for the G20 meeting lists finalizing the international tax deal as a "top priority."

It said the G20 should urge countries and jurisdictions participating in the tax deal "to finalize discussions on all aspects of Pillar 1, with a view to signing the Multilateral Convention (MLC) by summer end and ratifying it as soon as possible."

Meanwhile, Canada in July became the eighth country to impose a unilateral digital services tax, with Finance Minister Chrystia Freeland saying it was "simply not reasonable, not fair for Canada to indefinitely put our own measures on hold" after the June 30 deadline passed without a Pillar 1 agreement.

The U.S. maintains that such taxes are discriminatory because they specifically target the local revenues of U.S. technology firms that dominate the sector.

"Treasury continues to oppose all tax measures that discriminate against U.S. businesses," a U.S. Treasury spokesperson said in response to Canada's move. "We encourage all countries to finalize the work on the Pillar 1 agreement. We are in active discussions on next steps related to the existing DST joint statements."

A spokesperson for the U.S. Trade Representative's office added that the OECD/G20 negotiations "offer the best path to address challenges that digitalization of the economy poses to the international tax system."

Treasury Secretary Janet Yellen told Reuters at a G7 finance meeting in May that India and China were hindering agreement on the alternative transfer-pricing mechanism known as "Amount B."

This mechanism would apply to thousands of companies below the $20 billion annual revenue threshold for "Amount A" and is aimed at delivering tax certainty to these firms through an objective way of calculating tax liability.

☐ 07/25/2024

---

| Guatemala |
|---|

**Guatemala Announces Tax Bill Introducing Anti-Avoidance Measures**

The Tax Authority *(Superintendencia de Administración Tributaria, SAT)* has announced a tax bill introducing anti-avoidance measures to battle VAT and corporate income tax evasion. Some of the most important measures proposed are the following:

- introduction of transfer pricing to transactions between local related parties.
- amending and clarifying regulations regarding non-deductibility of costs and expenses.
- amending VAT withholding regulations.
- modernization of audit procedures; and
- updating and clarifying VAT credit regulations.

Additionally, the SAT proposed to allow access to financial information without judicial authorization and allow the exchange of information with other jurisdictions.

The SAT proposed the above tax avoidance measures in a press release dated July 2, 2024. Subsequent developments will be reported.

☐ 07/25/2024

| Suriname |
|---|

**Suriname Government Prepares for OECD Pillar Two Introduction**

The government has started discussions with relevant stakeholders on the introduction of the OECD Pillar Two global minimum tax on profits of large multinational enterprises (MNEs). These discussions were initiated with a masterclass organized by the tax authority together with other partners on July 17, 2024.

The masterclass provided a platform for the exchange of ideas about this subject by key persons from the National Assembly, large local companies, MNEs with branches in Suriname and tax advisors.

The Minister of Finance and Planning underlined the importance of tax legislation and the need for policy in this area to ensure efficient tax collection from MNEs based in Suriname. The OCED Pillar Two implementation will aid the government in fighting MNE tax avoidance as these companies will pay a 15% basic tax in the countries where they have operations.

☐ 07/25/2024

# Treaty Development

| Angola-Rwanda |
|---|

**Angola's Parliament Approves Tax Treaty With Rwanda**

The Angolan National Assembly on July 19 approved for ratification the income tax treaty with Rwanda, according to a release published on its website.

The treaty was signed April 15, 2022, in Kigali. It stipulates that dividends, interest, royalties, and fees for technical services are taxable at a top rate of 10 percent. Both countries generally use the credit method to eliminate double taxation.

This is the first agreement of its kind between the two countries. It will enter into force upon the exchange of ratification instruments, and its provisions will apply from January 1 of the year following entry into force. Rwanda ratified the agreement in July 2022.

☐ 07/25/2024

**Chile-Paraguay**

**Chile and Paraguay Initial Revision to Tax Treaty**

Representatives of Chile and Paraguay on July 17 initialed a revision to update the countries' income and capital tax treaty, according to a release published the same day by the Paraguayan Ministry of Foreign Affairs.

During bilateral talks in August 2020, Paraguayan officials expressed interest in updating the 2005 treaty to reflect the latest OECD standards. This would be the first update to the treaty, which was signed in Santiago on August 30, 2005, and has been in effect since 2009. It must be signed and ratified by both contracting parties before entering into force.

☐ 07/25/2024

**Kuwait-United Arab Emirates**

**Kuwaiti Council of Ministers Approves Tax Treaty with United Arab Emirates**

The Kuwaiti Council of Ministers on July 8 issued a decree approving for ratification the income and capital tax treaty with the United Arab Emirates, according to information published on Kuwait's online legal portal.

The treaty was signed February 11 in Dubai. It stipulates that dividends and interest are taxable only in the beneficial owner's state of residence, while royalties and fees for technical services are taxable at a top rate of 10 percent. Both countries generally use the credit method to eliminate double taxation.

This is the first agreement of its kind between the two countries. It will enter into force upon the exchange of ratification instruments, and its provisions will generally apply from January 1 of the year following entry into force.

☐ 07/25/2024

**Turkey-Zambia**

**Turkey and Zambia Initial Tax Treaty**

According to a press release of July 22, 2024, by the Turkish Revenue Administration, Turkey and Zambia initialed a tax treaty on July 18, 2024, following a successful second round of negotiations held in Ankara from July 17 to 18, 2024.

This would be the first agreement of its kind between Turkey and Zambia. It must be signed and ratified by both contracting parties before entering into force.

☐ 07/25/2024

# EXHIBIT 12

Login    Create Account

INTERNATIONAL TAX RESEARCH AND COMPLIANCE EXPERT

# The world's most complete array of cross-border tax analysis and data

Book a Meeting    Find out more ↓



# Overview

Comprehensive analysis of tax regimes with embedded tools to put your research into action.

Create Account

[integrated translation](), [modelling and calculation tools]() so you can immediately apply your research to your daily workflow.

Covering 195 jurisdictions, this unique and trusted resource saves you time by putting a full range of international tax research materials and tools in one easy-to-use solution.



## Tax rates and country analysis

- Updated daily
- Editable & customizable based on entities and cross-border transactions
- Shareable in custom reports

Create Account



# Tax forms in original language and certified English translations

- Corporate income tax

- VAT

Create Account



## Worldwide Tax Treaties

- Complete text and English translations including treaty status and effective date

- Related Treaty Documents such as OECD, UN & US Model Conventions and EU Directives

Create Account



## Translation Tools

Translate documents from any language to another, including scanned documents, PDF, Word or excel while maintaining the format of the original document.



## Modelling & Calculation Tools

Create Account

withholding tax.



## Shareable in custom reports

Create Account

- Law Changes

- Calculation Results

- Document Translations



## Interactive and Customizable Dashboards

Compare data across jurisdictions, timelines and tax topics.

# Powerful Collaboration Tools

Add any Orbitax solution license to receive a host of complimentary powerful tools to integrate with your daily workflow...

Create Account

## Dashboard & Analytics

Get an overview of various data elements being maintained on the Orbitax platform including footprint data and data from the Orbitax Tax Rules & Rates Database. Powered by Microsoft Power BI.



## Contacts & Chat

Import your list of contacts into Orbitax, assign roles and permissions, and chat with individuals or create custom groups to discuss data population, filing obligations and anything in between.



## Video Meetings

Use the built-in Orbitax Meet feature to start or schedule a video meeting with members from your Orbitax Contacts list. Arrange meetings, share your screen and save meeting recordings to the Orbitax Drive.



## Document Repository

Secure document storage and management for all your tax documentation, files and meeting notes. Boost your file storage premium features available with the [Orbitax Drive](Orbitax Drive).



## Task Manager

Create Account

tasks from the powerful Task Manager dashboard.



### Activity Tracker

Automatically monitors and displays all activity across your Orbitax projects, including when users log in, change/upload data, along with timestamps and ability to generate comprehesive audit reports.

# Explore the Orbitax International Tax Platform



## AI Tax Assistant (XatBot)

AI powered tax assistant for international tax questions

Learn More →



## Audit Tracker

A complete solution for audit and glol controversy tracking

Learn More →

Create Account

# Contact Us

For demo requests, technical support, general enquiries and feedback, please send us a message. A member of the Orbitax Team will get back to you shortly.



📞   +1 518 337 1860

✉   info@orbitax.com

Create Account

Last name*

Email*

Phone number

Company name*

Message*

Submit

## Solutions

Tax Research & Compliance

Global Minimum Tax

Due Date Tracker

Executable Actions Tool (E.A.T.)

## Tax Hub

Tax News & Alerts

Expert Corner

Corporate Tax Rates

Withholding Tax Rates

Create Account

Entity Designer                                  Country Chapters

Change Reports Tracker

DAC6 & MDR Reporter

Orbitax Drive

International Tax Calculator

CbC Compliance & Reporting

Withholding Tax Implementer

AI Tax Assistant (XatBot)

## Orbitax

Company

Contact Us

Partners                                         Copyright © 2025 Orbitax
                                                 All Rights Reserved
Follow us on LinkedIn
                                                 Privacy Policy
Subscribe to the Newsletter
                                                 Terms of Use
Patent Information

# EXHIBIT 13



# Renewal Notice

400 South Maple Ave
Suite 400
Falls Church, Virginia 22046

88377 Justine Voong
Transaction #: 38945
Account Executive: 100499 Kevin Williams
7/3/2024
Terms: Due on receipt

**Bill To**

Justine Voong
217 Sunset Court
Pacifica CA 94044-2165
United States

**Ship To**

Justine Voong
217 Sunset Court
Pacifica CA 94044-2165
United States

| Qty | Description | Subscription Period |
|-----|-------------|---------------------|
| 1 | Tax Notes Today International Tax Notes International - Online Worldwide Tax Treaties | 8/24/2024 - 8/23/2025 |

| | |
|---|---|
| **Subtotal** | $4,840.00 |
| **Estimated Tax*** | $0.00 |
| **Total** | $4,840.00 |

Billing Schedule :
Upon Signature -- $4,840.00

*In addition to any license fees payable to Tax Analysts, you (the Subscriber) are also responsible for all applicable sales and use taxes. In some states you are responsible for the payment of such taxes directly to the appropriate taxing authority and Tax Analysts will have no obligation or liability for doing so in those instances. Tax Analysts will collect such taxes only if, in Tax Analysts' reasonable determination, Tax Analysts is obligated to do so and may be liable for the payment of such taxes, and they will be included as a separate item on your invoice(s) as calculated at time of each invoice.

**☐ Is your Company Tax Exempt? If so, please provide a current copy of your Tax Exempt form along with this signed document.**

**Please return this form with your signature**

To continue your subscription(s), please sign and return to your Tax Analysts Account Exec. Upon receipt of the signed document you will be invoiced. Invoices are due based on the agreed upon terms. Please review the Terms and Conditions: www.taxnotes.com/website-terms-conditions.

Docusigned by:

*Justine Voong*

380E33E146EC4D9...

7/25/2024 | 12:39:15 AM EDT

_____    _____
Signature                                          Date

# Tax Notes and Tax Analysts Website Terms & Conditions

**Revised:  September 7, 2023**

## DATA PROTECTION AND PRIVACY NOTICE

At Tax Analysts, we regularly review our data protection and privacy policies for our website, www.taxnotes.com (Site). We do this because we understand the importance of protecting your personal information as you use our industry-leading tax news, commentary, and research tools

On May 25, 2018, the General Data Protection Regulation (GDPR) became effective, Tax Analysts has updated our privacy policy; you'll find it here. To be certain we are GDPR-compliant, we are asking for your specific consent to collect, maintain, and use your information and communicate with you.

**What Information We Collect.** When you subscribe to and use Tax Analysts' products online, we will receive information about you. How much and what kind of information depends on how you use our website and our products. Non-personal information does not by itself identify a specific individual. Personally identifiable information tells us specifics about who you are, such as your name, your email address, or your telephone number. Tax Analysts may collect both personal and non-personal information from you.

**How We Use Your Information.** We may use information that we collect about you or that you provide to us for several purposes, including:

- To carry out our obligations and enforce our rights arising from any subscriptions or contracts entered into between you and us, including for billing and collection.
- To provide you with information, products, or services that you request from us.
- To communicate with you regarding products or services that may be of interest to you, provided you have not opted out of receiving this type of information.
- To provide you with notices about your account or subscription, including expiration and renewal notices.
- For other specific purposes for which you provide information to us and for which you give us specific consent to use that information.

These are only some of the reasons Tax Analysts obtains, keeps, and processes information about you. More information is found in our

privacy policy, here.

**Disclosure of Your Information.** We may disclose aggregated information that does not identify any individual without restriction. We may disclose personal information to third parties that assist us in providing or managing our products and services.

**Data Retention.** Tax Analysts will keep your information as long as your subscription account is active and we have a contractual relationship with you to provide our publications, or as long as legal obligations require us to keep the information, as long as you do not exercise your right to delete the information.

**Accessing and Correcting Your Information.** You can review and change some of your personal information by logging into the Site and visiting your "My Profile" page. You have the right to access, change, restrict, and delete your information. You should be aware, however, that the only way to delete your personal information is to delete your user account and if you delete your user account, you'll terminate your access to Tax Analysts' publications.

You may also exercise your rights by contacting us at:

Website: https://www.taxnotes.com/support

By mail:  Tax Analysts

400 S. Maple Ave. Suite 400

Falls Church, VA 22046

Attn: Customer Support team

You may find a complete copy of the Tax Analysts privacy policy here.

## TERMS & CONDITIONS

Welcome to Tax Analysts and our websites! We hope that you will find the information on this website helpful and informative, and we appreciate your feedback on how Tax Analysts can best provide you with the information you need. For the enjoyment and protection of all Tax Analysts subscribers and other visitors to our websites we have prepared the following Terms and Conditions of Use (the "Terms"), which govern your access to, and use of, the content (the "Content"), at each of our websites, including www.taxnotes.com, and www.taxanalysts.org (each, as applicable, the "Site").

**These terms apply to every visitor to all of the websites owned or administered by Tax Analysts. When you access and use this Site you affirm that you have read these terms and the Tax Analysts privacy policy (located here) and you agree to be bound and abide**

by them. This is a contract between you and Tax Analysts. - please read it carefully. If you do not agree, you must not access the Site or use any of the Content found at the Site.

**Changes to these Terms; Content Updates.** Tax Analysts reserves the right to change the Site and these Terms at any time, and at our discretion. When any change is made a revised version will be posted here and will be effective as of the "revised" date. If you continue to use the Site after the effective date, you will be agreeing to the changed Terms because you are expected to check this page from time to time so you are aware of any changes. Tax Analysts may update the Content on the Site from time to time, but such Content is not necessarily complete, up-to-date or the most current. Any of the Content on the Site may be out of date at any given time, and Tax Analysts is under no obligation to update such material.

**Violation of these Terms.** If Tax Analysts finds that any violation of these terms has occurred, Tax Analysts reserves the right to respond to the violation within the limits of the law, and without prior notification or warning. Such response can include termination of the violator's use of the site, banning of future use, legal redress, or any other action deemed appropriate by Tax Analysts. If the violation affects any third-party affiliates, such as credit card processors or other users, these parties could also take action as allowed for by their individual policies and applicable law. Please note that by violating the terms and conditions of this site, a user forfeits rights provided within the Privacy Policy. Further details about the remedies for violation of the Terms may be found below.

**Consent to Receive Emails** . By using this Site, you consent to receive emails from Tax Analysts, which may include "operational" emails that are account- or service-related. As long as you maintain an account or register for Tax Analysts services, you may not "opt-out" of receiving such emails from Tax Analysts. You may also receive product information emails, which you can opt out of using the "Unsubscribe" link at the bottom of the email.

## Regarding Site Access

To access most of the Content on taxnotes.com you must subscribe to one or more of the Tax Analysts services or publications, and you must register the first time you visit the Site. However, some of the Content on taxnotes.com does not require registration. Regardless, these terms and conditions of use will govern all of your access and use of that Site, as well as taxanalysts.org which is open to the public, whether you register or not.

**Registration.** If registration is required, you must provide correct, current and complete information during the registration process. You also agree to maintain and promptly update your account information to keep it accurate, current and complete. What we do with the information you provide and how we may use it is governed by our Privacy Policy. You should review the Privacy Policy, which is incorporated as part of these Terms. By agreeing to these Terms you consent to all actions we take with respect to your information consistent with our Privacy Policy.

**User Name and Password.** If registration is required to access subscription Content you must also choose, or will be provided with, a user name, password or other information as part of our security procedures. You must treat such information as confidential, and you must not disclose it to any other person or entity. You also acknowledge that your account is personal to you and agree not to provide any other person with access to the Site using your user name, password or other security information. You agree to notify us immediately of any unauthorized access to or use of your user name or password or any other breach of security. You also agree to ensure that you exit from your account at the end of each session. You should use particular caution when accessing your account from a public or shared computer so that others are not able to view or record your password or other personal information.

Tax Analysts may require you to change your password if it has been compromised, or from time-to-time as a security precaution. Tax Analysts may deny you access or cancel your access for any reason, and at any time.

**Free Trials.** If you subscribe for a "free trial" you will be required to register as a subscriber. After a period, determined by Tax Analysts, your "free trial" will become deactivated.

## Regarding the Content

**Not Legal Advice.** The Site and the Content are made available solely for general information purposes. The Content and other information and services on the Site are not intended to and shall not be used as legal or tax advice. You use the Content, information, and services on the Site at your own risk.

Tax Analysts does not warrant the accuracy, completeness or usefulness of any Content or other information. Any reliance you place on such Content or information is strictly at your own risk. We disclaim all liability and responsibility arising from any reliance placed on any Content or information by you or any other visitor to the Site.

**Third Party Content.** This Site may include content provided by third parties, including materials provided by other users (see "User Contributions" below), by other organizations, or by governmental agencies, both domestic and foreign. Tax Analysts does not represent or endorse, and is not affiliated with any of these persons or entities. All statements and/or opinions expressed in these materials, and all articles and responses to questions and other content are solely the opinions and the responsibility of the person or entity providing those materials. These materials do not necessarily reflect the opinion of Tax Analysts. Under no circumstance will Tax Analysts be responsible or liable to you or any third party, for the legality, content or accuracy of any materials provided by any third parties.

**Links to Other Web Sites.** If the Site contains links to other websites and resources provided by third parties, these links are provided for your convenience only. Tax Analysts has no control over the contents of those sites or resources, and accept no responsibility for them or for any loss or damage that may arise from your use of them. If you decide to access any of the third party websites linked to this Site, you do so

entirely at your own risk and subject to the terms and conditions of use for such websites.

## Content Ownership and Your License

**Ownership of the Content.** All of the content (including, without limitation, the information, documents, summaries, other text, data, tables, graphs, charts, displays, images, audio and video, and all source code at the Site (collectively the "Content")) is either owned or controlled by Tax Analysts, or is used at the Site with the permission of its respective owner(s). As a general rule, your permitted use(s) of the Content are controlled by the license granted below; please note however, that your use(s) may also be controlled by a separate subscription agreement, for example through your employer or other organization. Any such agreement is incorporated in and made a part of these Terms. If there is a conflict between these Terms and such an agreement, these Terms will take precedence.

**The Tax Analysts name, the trademarks and trade names appearing on the Site and all related names, logos, product and service names, designs and slogans are trademarks of Tax Analysts or its affiliates or licensors. You must not use such marks without the prior written permission of Tax Analysts.**

**Limited License.** As a registered subscriber, you are granted the right to access the Site and the Content, and Tax Analysts grants you a limited, non-exclusive, non-sublicensable and non-transferable right and license to review, download and reproduce (in hard copy or electronic form) one copy of any portion of the Content included in your subscription, solely in the regular course of tax and business research for you or your clients. You may also reproduce and distribute limited excerpts and quotations from such Content, again solely in the regular course of tax and business research for you and your clients. Such Content may not be altered or modified, and you must always give proper attribution to Tax Analysts as the source of such material. Any copyright, trademark or other proprietary rights notices used with or made a part of any such Content may not be deleted or altered, and must be reproduced and distributed in their entirety. No right, title or interest in or to the Site or any Content is transferred to you, and all rights not expressly granted are reserved by the Tax Analysts. Any use of the Site or any Content not expressly permitted by these Terms is a breach of these Terms and may violate copyright, trademark and other laws.

**Other Uses Prohibited.** Unless you have Tax Analysts' prior written consent, any other sale, reproduction, distribution, modification, creation of derivative works of, display, republication, download, storage or transmittal of any Content is strictly prohibited. Without limiting the foregoing, prohibited uses include an use(s) for artificial intelligence technologies such as large language models, generative AI, or training a machine learning or AI system. If you print, copy, modify, download or otherwise use or provide any other person with access to any part of the Site in breach of the Terms of Use, your right to use the Site will cease immediately and you must, at our option, return or destroy any copies of the materials you have made.

**Reproduction Requests.** If you wish to make any use of material on taxnotes.com other than that set out in this section, please contact Tax

Analysts at customer.service@taxanalysts.org. If you wish to make any use of material on taxanalyst.org other than that set out in this section, please contact Tax Analysts at communications@taxanalysts.org.

**Prohibited Activities.** In connection with your access to the Site and use of any Content under these Terms, you may not:

- attempt to gain unauthorized access to the Site, or interfere with the operation of the Site in any way, including conduct that restricts or inhibits anyone's use or enjoyment of the Site, or otherwise interferes with the proper working of the Site.
- use the Site for any illegal purpose, or violate any applicable laws or regulations.
- create a false identity for the purpose of subscribing and gaining access to the Site.
- defame, abuse, harass, threaten or otherwise violate the legal rights (such as rights of privacy or publicity) of others.
- submit any content that is unlawful, fraudulent, inappropriate, libelous, profane, defamatory, infringing, obscene, indecent, constitutes hate speech, or is otherwise objectionable, or infringes the intellectual property rights of Tax Analysts or anyone else.
- engage in spamming, spoofing, flooding or similar activities, or harvest or collect information about others, including email addresses, without their consent.
- "frame" or "mirror" any part of the Site.
- remove any trademark, copyright, or other proprietary notice(s) on the Site.
- use any automated software program, spider, web-crawler, URL checker, robot, or other type of site search tool to retrieve, index, data mine or otherwise access the Site or reproduce any Content, without the express prior written consent of Tax Analysts, provided, however, search engines may "crawl" the Site solely for the purpose of making publicly available searchable indices.
- use any automated software to access, download, or reproduce the Site or any Content at the Site.
- display, distribute, create derivatives from, reproduce, or modify, the Site (in whole or in part) or any Content.
- introduce any viruses, trojan horses or other material which is malicious or technologically harmful, or attack the Site via a denial-of-service attack or a distributed denial-of-service attack.
- send, knowingly receive, upload, download, use or re-use any material which does not comply with the Content Standards set out in these Terms.

**User Contributions**. The Site may contain message boards, forums, bulletin boards and other interactive features (collectively, "Interactive Services") that allow users to post, comment, submit, publish, display or transmit to other users or other persons ("Post") content or materials (collectively, "User Contributions") on or through the Site. All User Contributions and use of the Interactive Services must comply, in their entirety, with all applicable laws and regulations. In addition, User Contributions must not:

- Contain any material which is defamatory, obscene, indecent, abusive, offensive, harassing, violent, hateful, inflammatory or otherwise objectionable.

- Promote sexually explicit or pornographic material, violence, or discrimination based on race, sex, religion, nationality, disability, sexual orientation or age.
- Infringe any patent, trademark, trade secret, copyright or other intellectual property or other rights of any other person.
- Violate the legal rights (including the rights of publicity and privacy) of others or contain any material that could give rise to any civil or criminal liability under applicable laws or regulations or that otherwise may be in conflict with these Terms and our Privacy Policy.
- Be likely to deceive any person.
- Promote any illegal activity, or advocate, promote or assist any unlawful act.
- Cause annoyance, inconvenience or needless anxiety or be likely to upset, embarrass, alarm or annoy any other person.
- Impersonate any person, or misrepresent your identity or affiliation with any person or organization.
- Involve commercial activities or sales, such as contests, sweepstakes and other sales promotions, barter or advertising.
- Give the impression that they emanate from or are endorsed by us or any other third person or entity.

**Any User Contribution you post to the site will be considered non-confidential and non-proprietary. By providing any User Contribution on the Site, you grant us and our licensees, successors and assigns the right to use, reproduce, modify, perform, display, distribute and otherwise disclose to third parties any such material.** You represent and warrant that you own or control all rights in and to the User Contributions and have the right to grant the license granted above to us and our licensees, successors and assigns. You further represent and warrant that all of your User Contributions do and will comply with these Terms of Use.

You understand and acknowledge that you are solely responsible for any User Contributions you submit or contribute, and you, not Tax Analysts, have fully responsibility for such content, including its legality, reliability, accuracy and appropriateness. You acknowledge and agree that Tax Analysts will have the sole and discretionary right, but no obligation, to edit, remove, modify, publish, transmit, and display any or all User Contributions. User Contributions may also be made available for republishing through other formats.

You expressly waive any rights you may have in having the material altered or changed in a manner not agreeable to you. Tax Analysts is not, and will not be, responsible or liable to any third party for the content or accuracy of any User Contributions posted by you or any other user of the Site.

Tax Analysts has the right to, in its sole discretion and at any time, to:

- Remove or refuse to post any User Contributions for any or no reason in our sole discretion.
- Take any action with respect to any User Contribution that we deem necessary or appropriate in our sole discretion, including if we believe that such User Contribution violates the Terms of Use, including the Content Standards, infringes any intellectual property right or other right of any person or entity, threatens the personal safety of users of the Site or the public or could create

liability for Tax Analysts.

- Disclose your identity or other information about you to any third party who claims that material posted by you violates their rights, including their intellectual property rights or their right to privacy.
- Take appropriate legal action, including without limitation, referral to law enforcement, for any illegal or unauthorized use of the Site.
- Terminate or suspend your access to all or part of the Site for any violation of these Terms of Use.

Without limiting the foregoing, we have the right to fully cooperate with any law enforcement authorities or court order requesting or directing us to disclose the identity or other information of anyone posting any materials on or through the Site. You waive and hold harmless Tax Analysts and its licensees from any claims resulting from any action taken by Tax Analysts during or as a result of its investigations and from any actions taken as a consequence of investigations by either such parties or law enforcement authorities.

We do not undertake to review all material before it is posted on the Site, and cannot ensure prompt removal of objectionable material after it has been posted. Accordingly, we assume no liability for any action or inaction regarding transmissions, communications or content provided by any user or third party. We have no liability or responsibility to anyone for performance or nonperformance of the activities described in this section.

***Linking to the Site and Social Media Features.*** You may link to the pages within the Site, provided you do so in a way that is fair and legal and does not damage our reputation or take advantage of it. In addition, you must not create a link in such a way as to suggest any form of association, approval or endorsement on our part without our express written consent.

The Site may provide certain social media features that enable you to:

- Link from your own or certain third-party websites to certain content on this Site.
- Send e-mails or other communications with certain content, or links to certain content, on this Site.
- Cause limited portions of content on this Site to be displayed or appear to be displayed on your own or certain third-party websites.

You may use these features solely as they are provided by us and solely with respect to the content they are displayed with and otherwise in accordance with any additional terms and conditions we provide with respect to such features. Subject to the foregoing, you must not:

- Establish a link from any website that is not owned by you.
- Cause the Site or portions of it to be displayed, or appear to be displayed by, for example, framing, deep linking or in-line linking, on any other site.

- Otherwise take any action with respect to the materials on this Site that is inconsistent with any other provision of these Terms of Use.

Tax Analysts reserves the right to withdraw linking permission without notice, and in our discretion. Tax Analysts may also disable all or any social media features and any links at any time without notice, and in our discretion.

## Infringement Notices under the Digital Millennium Copyright Act

Tax Analysts will respond to allegations of copyright violations in accordance with the Digital Millennium Copyright Act (DMCA). The DMCA provides a process for a copyright owner to give notification to an online service provider concerning alleged copyright infringement. When a valid DMCA notification is received, Tax Analysts' policy is to take down the offending content. We will also take reasonable steps to contact the owner of the removed content so that a counter-notification may be filed. Tax Analysts may provide copies of such notices and/or counter-notices to the participants in the dispute or to any other third parties, at our discretion and as required by law. Tax Analysts' Privacy Policy does not protect information provided in these notices.

If you believe that your work was copied or posted on the Site in a way that constitutes copyright infringement, you should send us the following information:

- a description of the copyrighted work you claim to have been infringed. If you are not the owner of the copyrighted work, you must also include your electronic or digital signature as a person authorized to act on behalf of the copyright owner.
- a description of where the material that you claim is infringing is located on the Site;
- Information reasonably sufficient to permit Tax Analysts to contact you, such as an address, telephone number, and if available, an electronic mail address at which you may be contacted;
- a statement that you have a good faith belief that the disputed use of the material is not authorized by the copyright owner, its agent, or the law; and
- a statement by you, made under penalty of perjury, that the information in your notification is accurate, and that you are the copyright owner or are authorized to act on behalf of the copyright owner.

Notices and counter-notices should be sent to:

Paige Jones
Editor in Chief, Acquisitions & Engagement
Tax Analysts, Inc.
400 S. Maple Street

Falls Church, VA 22046

Email: paige.jones@taxanalysts.org

## Streaming Content

From time to time Tax Analysts offers live or pre-recorded streaming content to Site users. Some events may require an additional registration.

**Event Participation.** Live streaming media event participation may require you to configure your software settings on your web device on first use, require you to download the software for your operating system. Note that you may require administrator privileges on your computer to be able to manually install software.

**Quality of Services.** The quality (e.g., the resolution) of streaming content, as well as the download speed of downloadable content (if any), may be affected by a variety of factors such as your location, the content being streamed or downloaded, and the speed of your Internet connection. Tax Analysts makes no representation or warranty regarding access to content available through the Site, including the quality of streaming content and the download speed of downloadable content (if any). Users are solely responsible for obtaining and maintaining all telecommunications, broadband and Internet access to reach the Site, and for all hardware and software necessary to reach and access the Site and all content (of any kind) on the Site, as well as all related charges, fees, etc.

**Event Cancellation or Postponement.** If a live streaming media event must be postponed or cancelled for any reason, including inclement weather, reasonable efforts will be made to notify registrants via email address. Your continuing education credit(s) may be earned at a subsequent event, and any fees or charges paid will be credited toward such future event. No refunds will be granted by Tax Analysts. The foregoing notwithstanding, Tax Analysts reserves the right to cancel or postpone any live streaming media event at any time, and for any reason, without prior notice.

**Event Content.** No content from any streaming media event (wither live or recorded) may be copied, reproduced, framed, hyperlinked, republished, downloaded, uploaded, posted, transmitted, captured, recorded or distributed in any way or for any reason. All such content is the sole and exclusive property of Tax Analysts.

**No Professional Advice** Any content broadcast, contained or available by or through this Site has been prepared as a service to Site users, and is not intended to constitute legal, accounting, tax or financial advice from a professional accountant, attorney, certified financial planner or tax preparer.

## Disclaimer of Warranties, Liability Limits and other Legal Disclaimers

Tax Analysts cannot and does not guarantee or promise that the Site or any Content will meet your needs or expectations. Tax Analysts uses reasonable efforts to collect, prepare and provide users with information and material but does not represent, warrant or guarantee any of the Content for any reason. Further, Tax Analysts does not and cannot represent or warrant that the Site or any portion of the Site will always be accessible, or that it will be error-free, complete, secure, reliable, or accurate.

You understand that Tax Analysts cannot and does not guarantee or warrant that files downloaded from the internet or the Site will be free of viruses or other malicious code. You are responsible for implementing appropriate and sufficient anti-virus protection, and for maintaining a means external to the Site for any reconstruction of any lost data. Tax Analysts will not be liable for any loss or damage caused by a distributed denial-of-service attack, viruses or other technologically harmful material that may infect your computer equipment, computer programs, data or other proprietary material due to your use of the site or any services or items obtained through the site or to your downloading of any material, or on any linked website.

Your use of the Site is entirely at your own risk. The Site, its Content and any services or items obtained through the Site are provided on an "as is" and "as available" basis. Tax Analysts hereby disclaims all warranties of any kind, whether express or implied, statutory or otherwise, including but not limited to any warranties of merchantability, non-infringement and fitness for particular purpose.

In no event will Tax Analysts, its affiliates or their licensors, the venues, employees, agents, officers or directors be liable for damages of any kind, under any legal theory, arising out of or in connection with your use, or inability to use, the Site, any websites linked to it, any Content on the Site or such other websites or any services or items obtained through the Site or such other websites, including any direct, indirect, special, incidental, consequential or punitive damages, including but not limited to, personal injury, pain and suffering, emotional distress, loss of revenue, loss of profits, loss of business or anticipated savings, loss of use, loss of goodwill, loss of data, and whether caused by tort (including negligence), breach of contract or otherwise, even if foreseeable.

**The foregoing does not affect any warranties or liability which cannot be excluded or limited under applicable law.**

You agree to defend, indemnify and hold harmless Tax Analysts, its affiliates, licensors and service providers, and its and their respective officers, directors, employees, contractors, agents, licensors, suppliers, successors and assigns from and against any claims, liabilities, damages, judgments, awards, losses, costs, expenses or fees (including reasonable attorneys' fees) arising out of or relating to your violation of these Terms or your use of the Site, including, but not limited to, any use of content, services and products other than as expressly authorized in these Terms.

Your sole and exclusive remedy, and Tax Analysts' and the Tax Analysts' parties' (as defined herein) entire liability, shall be a refund of prorated of any license fees and shall not exceed the total amount of any such fees paid in the prior 12 month period preceding the event giving rise to such claim. In no event will Tax Analysts, its affiliates or their licensors, content providers, service providers, employees, agents,

officers or directors (the "Tax Analysts parties") be liable for damages of any kind, under any legal theory, arising out of or in connection with your use, or inability to use, the site, any websites linked to it, any Content on the Site or such other websites or any services or items obtained through the Site or such other websites, including any direct, indirect, special, incidental, consequential or punitive damages, including but not limited to, personal injury, pain and suffering, emotional distress, loss of revenue, loss of profits, loss of business or anticipated savings, loss of use, loss of goodwill, loss of data, and whether caused by tort (including negligence), breach of contract or otherwise, even if foreseeable.

## Other Important Information

All disputes, claims or other matters relating to the Site and these Terms (including non-contractual disputes or claims), will be governed by and construed in accordance with the internal laws of the Commonwealth of Virginia without giving effect to any choice or conflict of law provision or rule (whether of the Commonwealth of Virginia or any other jurisdiction).

Any legal suit, action or proceeding arising out of, or related to, these Terms or the Site will be instituted exclusively in the federal courts of the United States or the courts of the Commonwealth of Virginia. You waive any and all objections to the exercise of jurisdiction over you by such courts and to venue in such courts. Any cause of action or claim you may have arising out of or relating to these terms of use or the website must be commenced within one (1) year after the cause of action accrues, otherwise such cause of action or claim is permanently barred.

If Tax Analysts waives any term or condition or fails to assert a right or provision in these Terms it will not be deemed a further or continuing waiver of such term or condition or a waiver of any other term or condition, nor will it constitute a waiver of such right or provision.

If any provision of these Terms is held by a court or other tribunal of competent jurisdiction to be invalid, illegal or unenforceable for any reason, such provision shall be eliminated or limited to the minimum extent such that the remaining provisions of the Terms will continue in full force and effect.

Except as noted herein, these Terms and our Privacy Policy constitute the sole and entire agreement between you and Tax Analysts with respect to the Site and the Content available through the Site, and supersede all prior and contemporaneous understandings, agreements, representations and warranties, both written and oral, between you and Tax Analysts.

If you have any questions about these terms and conditions, please contact us at (800) 955-2444.